**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LORRAINE H. LUCIANO, on behalf of herself and all others similarly situated, | |
| Plaintiff, | Civil Action No. 15-6726 (RK) (DEA) |
| v. | **OPINION** |
| TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA – COLLEGE RETIREMENT EQUITIES FUND (TIAA-CREF), et al., | |
| Defendants. | |

**KIRSCH, District Judge**

     **THIS MATTER** comes before the Court upon a Motion to Amend the ETS 401(a) Retirement Plan (the "Plan"), filed by Defendants Educational Testing Service ("ETS") and Educational Testing Service Employee Benefits Administration Committee ("EBAC"). (ECF No. 167.) Defendants College Retirement Equities Fund ("CREF") and Teachers Insurance and Annuity Association of America ("TIAA") joined the motion (ECF No. 170), Plaintiff Lorraine H. Luciano opposed (ECF No. 176), and Defendants replied (ECF No. 186). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth herein, Defendants' motion to reform is GRANTED.

## I.    **BACKGROUND**

     The following facts are derived from the multiple prior Opinions in this case. *See* ECF Nos. 59, 83, 111, & 136. The Court assumes the parties' familiarity with the background and procedural history of this matter and recites only the facts necessary to resolve the instant motion.

Plaintiff is the surviving spouse of James Rosso, who was employed by ETS from 1979 until 1993. During his employment, Mr. Rosso participated in two of ETS's retirement plans: a 401(a) Plan and a 403(b) Match Plan. Both plans are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et seq. These plans were administered by TIAA-CREF, which provides retirement and savings plan design, consultation, and administration for employee benefit plans. Notably, for purposes of the instant dispute, Section 7.3 of the 401(a) Plan provided for a Qualified Preretirement Survivor Annuity ("QPSA"), defined as follows:

> If a married Participant dies before benefits have commenced, then the Participant's Account Balance shall be applied toward the purchase of an annuity (or any other form of benefit determined by the Administrator) for the life of the Surviving Spouse (a "Qualified Preretirement Survivor Annuity") unless any other Beneficiary has been designated pursuant to a Qualified Election.

Mr. Rosso's initial beneficiary designation forms dating back to 1980 listed several family members as the beneficiaries under each account. They did not include Ms. Luciano, Plaintiff, whom Mr. Russo married decades later in 2004. When Mr. Rosso died in 2014, the beneficiary designation form for the 401(a) Plan listed only his sister, Lucille Rosso, as the sole beneficiary. This designation was made prior to his marriage to Plaintiff.

In 2015, Plaintiff filed an administrative claim with TIAA-CREF seeking to recover the entirety of her deceased husband's annuities (i.e., a 100% QPSA benefit). TIAA denied her claim and EBAC affirmed, finding that Section 7.3 of the 401(a) Plan and Section 8.4 of the 403(b) Plan — construed in conjunction with Plan communications issued to participants throughout the

relevant time period — provided only a 50% QPSA benefit to Plaintiff as the surviving spouse. The other half would go to Mr. Rosso's sister and pre-marriage beneficiary, Lucille Rosso.[1]

On or about October 1, 2015, Plaintiff thereafter filed her Amended Complaint, challenging, on behalf of a putative class, the 50% QPSA determination under the 401(a) and 403(b) Plans. The District Court, in an Opinion and Order by the Honorable Michael A. Shipp, U.S.D.J., compelled arbitration as to the 401(a) Plan and stayed the 403(b) claims pending the resolution of the arbitration.[2] (ECF Nos. 59–60.) The case was administratively terminated on July 29, 2016, pending the conclusion of the arbitration.

On April 30, 2018, Ira F. Jaffe, Esq. (the "Arbitrator") held that the terms of the 401(a) Plan were "clear and unambiguous and require[d] payment to [Plaintiff] of a . . . benefit based upon the full Account Balance value of Mr. Rosso's account[.]" (Arbitrator Initial Op. at 83, Ex. A to Pl's Opp. Br., ECF No. 176-1.)[3] Because the Arbitrator found the Plan to be unambiguous on its face, he declined to consider any extrinsic evidence in reaching his determination. (*Id.* at 81–83.)

On July 27, 2018, Defendants filed a Motion to Vacate the Arbitration Award and for Equitable Reformation of the subject Plan. (ECF No. 85.) Following oral argument on October 24, 2019, the Court entered its decision on the record, holding that Defendants' motion was premature because the Arbitrator had not yet issued his final award. "In the interest of judicial economy and

---

[1] Ms. Rosso, who intervened in this case, died during the pendency of the proceedings. The executrix of her estate, Josephine Mercantini Bocci, has since been substituted for her as a party. Ms. Bocci has not taken a position on the instant motion.

[2] As the instant motion only pertains to the 401(a) Plan, the Court will not discuss the terms and litigation surrounding the 403(b) Plan.

[3] The page numbers referencing the Arbitrator's opinion and court filings correspond to those in the ECF docket number, not those in the actual submission or opinion.

to avoid piecemeal litigation," the Court dismissed the motion without prejudice and allowed the motion to be refiled once the final award had been entered. (Oral Arg. Tr. 39:3–9, ECF No. 101.)

The Arbitrator issued the subject award on April 30, 2020, and Plaintiff thereafter filed a Motion to Confirm Arbitration Award and Reopen the Case. (ECF No. 103.) Defendants opposed the motion, arguing that the Arbitrator "manifestly disregarded the applicable law requiring that the EBAC be afforded significant deference" in its analysis of the Plan documents and the establishment of extrinsic ambiguity. (Defs.' Opp'n Br. at 13, ECF No. 108.) Defendants also requested permission to renew their motion for equitable reformation of the ETS plans. (*Id.* at 40.) On April 28, 2021, the Court issued a written decision confirming the Arbitrator's award in its entirety and reopened the case. (ECF No. 111.) In a footnote, the Court also granted Defendants' request to renew their motion for equitable reformation. *Id.* at 10 n.5.

On December 29, 2022, in accordance with the District Court's Opinion, Defendants again filed another motion seeking to reform the 401(a) Plan. In the motion presently before the Court, Defendants seek to correct a scrivener's error which occurred in the 2002 Restatement to the Plan and which led to the Arbitrator's ultimate interpretation that the Plan provided for a 100% QPSA benefit.[4] Specifically, Defendants assert that when outside counsel was hired to assist in amending the Plan to conform with laws unrelated to the QPSA benefit, counsel inadvertently removed a parenthetical reference in Section 7.3 to two exhibits. Those exhibits — a CREF annuity certificate and a TIAA annuity contract — each provided for a 50% surviving spouse benefit. The omission of these express references "had the unintended consequence of an arbitrator interpreting Section

---

[4] As described in greater detail herein, the language at issue was amended in a subsequent Plan Restatement issued on February 26, 2016. (Defs. Ex. 4, Decl. of John Basehore, ¶ 28, ECF No. 167-4.) Accordingly, Defendants' motion to reform pertains only to the version of the 401(a) Plan in effect from 2002 to February 26, 2016.

7.3 as providing for a QPSA benefit for a surviving spouse in the amount of 100% of the accumulated balance instead of 50%." (Defs. Supp. Br. at 4, ECF No. 167-1.)

Plaintiff opposes the motion on several grounds. First, Plaintiff argues that Defendants' motion is barred by New Jersey's six-year statute of limitations for reformation of contract claims. (Pl's. Opp. Br. at 16, ECF No. 176.) Second, Plaintiff argues that Defendants waived the argument for equitable reformation as they failed to raise it during the administrative proceedings or during arbitration. (*Id.* at 16–24.) Finally, on the merits, Plaintiff argues that the "law of the case" has already established that the annuity contracts do not set forth a 50% annuity (*id.* at 30); that all versions of the 401(a) Plan establish a 100% QPSA (*id.* at 31); and that Defendants misstate the law of equitable reformation and cannot make the requisite showing of either mutual mistake or fraud (*id.*).

## II.   <u>LEGAL STANDARD</u>

ERISA is designed to "protect[] employees' justified expectations of receiving the benefits their employers promise them." *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743 (2004). "[W]hen Congress enacted ERISA, it 'wanted to . . . mak[e] sure that if a worker has been promised a defined pension benefit upon retirement — and if he has fulfilled whatever conditions are required to obtain a vested benefit — he actually will receive it.'" *Id.* (quoting *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996)) (additional citations and quotations omitted). In light of ERISA's goal to protect an employee's settled expectations, allowing a party to equitably and retroactively reform a retirement plan creates a "tension with the statutory purpose of ERISA[.]" *Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1104 (3d Cir. 1996).

"Despite this potential tension with a statutory purpose of ERISA," the Third Circuit held that the scrivener's error doctrine may be invoked to modify ERISA plans under certain limited circumstances. *Int'l Union v. Murata Erie N. America, Inc.*, 980 F.2d 889, 907 (3d Cir. 1992). In

*Murata*, the Third Circuit addressed the issue, holding: "the mistake of a scrivener in drafting a document may be reformed based upon parol evidence, provided the evidence is clear, precise, convincing and of the most satisfactory character that a mistake has occurred and that the mistake does not reflect the intent of the parties." *Id.* at 907 (citation and quotations omitted). There, an employer sought to reform its pension plan to include a reversion clause that would allow it to recoup unforeseen excess funds that remained in the company's pension plan after all annuities had been purchased. *Id.* at 895. Notwithstanding the Plan's language that expressly prohibited the company from amending the Plans, the Third Circuit found that the scrivener's error doctrine permitted retroactive revision because the employees' "reasonable reliance on the [] Plan documents would probably not have led them to believe that there would be any excess funds remaining upon termination" or that the "excess would be distributed to them." *Id.* at 907.

Four years later, in *McCormick*, the Third Circuit reiterated the application of equitable reformation of an ERISA plan in certain circumstances. Citing *Murata*, *McCormick* provided, in pertinent part:

> The central holding of *Murata*'s scrivener's error discussion is that in circumstances where a court can establish that no plan participants were likely to have relied upon the scrivener's error in question in determining their rights and obligations under the plan, allowing reformation of the scrivener's error does not thwart ERISA's statutory purpose of ensuring that plan participants can rely upon the language.

*McCormick Dray Line, Inc.*, 85 F.3d at 1105 n.2. Under the facts of *McCormick*, the Court found that the employer could not use the scrivener's error doctrine to reform the collective bargaining agreement at issue, and that its holding did not "gut" *Murata*'s holding "in any way." *Id.* Subsequent district courts in our Circuit to consider the equitable reformation of ERISA claims have relied expressly on the instructions set forth by *Murata* and *McCormick. See, e.g., Stanford*

6

*v. Foamex L.P.*, No. 07-4225, 2010 WL 3488651 (E.D. Pa. Aug. 31, 2010); *Waters v. Wells Fargo & Co. Cash Balance Plan*, No. 18-16832, 2020 WL 7841163 (D.N.J. Dec. 30, 2020).

## III.  <u>DISCUSSION</u>

Before considering Defendants' equitable reformation claim, the Court first addresses Plaintiff's arguments that the Court should not reach the merits.

### A.  STATUTE OF LIMITATIONS

Plaintiff first argues that Defendants' Motion to Reform is barred by New Jersey's six-year statute of limitations for contract actions because Defendants' claim accrued in 2002, the date the alleged scrivener's error occurred. (ECF No. 176 at 22–23.) Plaintiff's argument is predicated on two tenuous assertions: that Defendants' motion is subject to a statute of limitations, and that the Court should apply New Jersey law to the claim accrual analysis. As set forth below, Defendants' reliance on the doctrine of equitable reformation, whether as an affirmative defense or de facto counterclaim, is not barred by a statute of limitations.

The procedural history of this case does not indicate that Defendants' motion is in fact a "claim" subject to a statute of limitations. Defendants have presented their reformation argument as an affirmative defense. (*See* Ans. at 22, ECF No. 129 (the sixth affirmative defense in its responsive pleading, that "[t]o the extent that the plan documents of the 401(a) Plan and the 403(b) Plan may appear to require that Plaintiff be awarded the benefits she claims . . . each such plan document contains a scrivener's error which is subject to being reformed by the Court to conform it to the intent of the Plan's sponsor.").) Affirmative defenses are generally not subject to statutes of limitations. *See United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 72 (1956) ("To use the statute of limitations to cut off the consideration of a particular defense in the case is quite foreign to the policy of preventing the commencement of stale litigation."); *City of Saint Paul, Alaska v. Evans*, 344 F.3d 1029, 1033 (9th Cir. 2003) ("[C]ourts generally allow defendants to raise defenses that,

if raised as claims, would be time-barred."); *Wells v. Rockefeller*, 728 F.2d 213, 214 (3d Cir. 1984) ("To the extent that the claims made . . . in [the] answer were in the nature of recoupment or affirmative defenses, they were not barred by the statute of limitations[.]").

Plaintiff does not suggest — and the Court does not find — that an equitable reformation argument may not be raised as an affirmative defense. *See Waters v. Wells Fargo & Co. Cash Balance Plan*, No. 18-16832, 2020 WL 7841163 (D.N.J. Dec. 30, 2020) (raising equitable reformation as an affirmative defense [*see* ECF No. 19 at 8]). However, other courts have construed motions to reform an ERISA plan as a counterclaim, which would indeed be subject to a statute of limitations. *See, e.g.*, *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 816–17 (7th Cir. 2010) (evaluating counterclaim for equitable reformation); *Stanford v. Foamex L.P.*, No. 07-4225, 2010 WL 3488651, at *1 (E.D. Pa. Aug. 31, 2010) (same).

Even assuming, *arguendo*, that the Court evaluated Defendants' motion as a counterclaim, the Court finds that the statute of limitations did not run because the claim did not accrue until it was well within the applicable statute of limitations period.

There is no dispute that were equitable reformation of an ERISA plan viewed as a counterclaim, the statute of limitations period would be six (6) years.[5] The Court disagrees, however, with Plaintiff's conclusory assertion that the Court must also apply New Jersey claim accrual analysis. Even where federal courts borrow a state's analogous statute of limitations, the date of accrual for federal claims is typically governed by federal law. *See Romero*, 404 F.3d at

---

[5] As ERISA does not provide the statute of limitations, the Court must identify the state statute of limitations for the most analogous state claim. *Romero v. Allstate Corp.*, 404 F.3d 212, 221 (3d Cir. 2005) ("The first step in borrowing a local time limitation is to determine the 'state claim most analogous to the ERISA claim pursued.'" (quoting *Gluck v. Unisys Corp.*, 960 F.3d 1168, 1179 (3d Cir. 1992))). Here, the parties and the Court agree that New Jersey's six-year statute of limitations for "recovery upon a contractual claim or liability, express or implied" would govern the instant claim. *N.J.S.A.* § 2A:14-1(a).

221 (discussing ERISA non-fiduciary duty claims); *PaineWebber Inc. v. Faragalli*, 61 F.3d 1063, 1066–67 (3d Cir. 1995) (stating, in the context of a Federal Arbitration Act claim, that "while a state statute of limitations may be 'borrowed' for a federal claim, federal, not state, law governs as to when the cause of action accrues"); *see also Bamgbose v. Delta-T Group, Inc.*, 638 F. Supp. 2d 432, 438 (E.D. Pa. 2009) (the "accrual date for federal claims is governed by federal law, irrespective of the source of the limitations period . . . [and] federal law uses a 'discovery rule' to determine the accrual date of a federal claim"). As the Seventh Circuit explained in a case with the precise posture as this one, "[t]he general federal common law rule is that an ERISA claim accrues when the plaintiff knows or should know of conduct that interferes with the plaintiff's ERISA rights." *Young*, 615 F.3d at 817 (citations omitted). Applying the rule, the Court then considered when the defendant "should have known that the scrivener's error in the [Plan], if left unreformed, would impede its rights under the Plan." *Id.*

*Murata* also suggests that the instant reformation claim would accrue when Defendants had actual knowledge of the error. There, the Third Circuit rejected the proposition that a claim arising under ERISA § 413 accrued on the date of amendment, because there was no evidence that "a controversy over the reversion of excess funds" yet existed. 980 F.2d at 901. Instead, the Court looked to the date when the parties learned there was an actual dispute. *Id.*; *see also Young*, 615 F.3d at 817 (citing *Murata* for the proposition that the "ERISA claim did not accrue when plan sponsor amended [the] plan absent evidence that participants knew of any potential controversy over amended language").

Here, Plaintiff provides no evidence in support of her assertion that the claim accrued in 2002, and the record plainly reflects that neither ETS, TIAA, nor EBAC believed that Section 7.3 at any time prior to the instant litigation provided for a 100% QPSA benefit. (*See* ECF No. 176-1

9

at 90–103.) Evidence provided in connection with Defendants' motion to reform (discussed further *infra*) indicates that all correspondence with plan participants communicated that spouses would receive a 50% QPSA benefit. (Defs. Ex. 4, Decl. of John Basehore, ¶¶ 16–28, ECF No. 167-4.) Defendants further represented that "[s]ince at least 1985, other than Plaintiff, no participant or beneficiary has challenged the longstanding interpretation of the Plan's QPSA requirements by TIAA or the EBAC, and no surviving spouse other than Plaintiff has asserted a claim for 100% of a participant's benefits." (ECF No. 85 at ¶ 83.) Under these circumstances, the Court cannot find that Defendants had knowledge of the mistake in 2002, much less that the mistake might give rise to a controversy requiring Defendants to raise an equitable reformation claim.

At the earliest, Defendants' claim might have accrued on June 18, 2014, the date Plaintiff sent a letter to TIAA-CREF indicating her contestation of the 50% benefit and intent to claim a 100% QPSA benefit. (*See* ECF No. 176-1 at 95 n.2.) Even then, it is dubious that Defendants could be said to have had knowledge that the amendment in Section 7.3 would give rise to an actual controversy. (This will be expounded further herein on the topic of waiver, *see* Section III.B(i).) Yet even if the Court were to accord the Plaintiff all the benefits of the doubt, Defendants' first motion for equitable reformation, filed approximately four years later on July 27, 2018 (ECF No. 85), falls well within New Jersey's six-year statute of limitations.

Accordingly, regardless of whether Defendants' motion is construed as an affirmative defense or as a counterclaim, the motion is not barred by a statute of limitations.

## B. WAIVER

Plaintiff's remaining argument contending that this Court should not reach the merits is that ETS waived its equitable reformation argument by failing to raise it during the administrative proceedings or arbitration. (ECF No. 176 at 23.)

i.    Failure to Raise During the Administrative Proceedings

Plaintiff characterizes Defendants' motion as a "*post-hoc* rationalization" that only arose after their other arguments failed (ECF No. 176 at 24). "[W]hether *post hoc* rationales may be considered in a *de novo* review remains an open question within the Third Circuit, although most district courts have held that *post hoc* arguments may not be considered." *Locklear v. Sun Life Assur. Co.*, No. 14-401, 2015 WL 1964675, at *6 (M.D. Pa. May 1, 2015) (citing *Nair v. Pfizer, Inc.*, No. 07-5203, 2009 WL 1635380, at *10 (D.N.J. June 10, 2009)). On a broader level, it is also unsettled whether the doctrine of waiver applies at all in the context of an ERISA claim. *See Lauder v. First Unum Life Ins. Co.*, 284 F.3d 375, 381 (2d Cir. 2002) (noting the circuit split); *White v. Provident Life & Accident Ins. Co.*, 114 F.3d 26, 29 (4th Cir. 1997) (holding that "the federal common law under ERISA . . . does not incorporate the principles of waiver and estoppel"). That said, courts in our circuit have interpreted the Third Circuit's decision in *Pacconi v. Trustees of the United Mine Workers of Am.*, 264 F. App'x 216, 217 (3d Cir. 2008), as advising district courts against considering an administrator's *post hoc* rationale in ERISA benefits cases. *See Locklear*, 2015 WL 1964675 at *6; *Becknell v. Severance Pay Plan of Johnson & Johnson*, No. 13-4622, 2014 WL 1577723, at *4 (D.N.J. Apr. 21, 2014).

*Pacconi* emphasized that in evaluating whether a rationale is *post hoc*, "a reviewing court must focus on the 'evidence available to the plan administrators at the time of their decision.'" *Pacconi*, 264 F. App'x at 217 (3d Cir. 2008) (quoting *Flinders v. Workforce Stabilization Plan*, 491 F.3d 1180, 1190 (10th Cir. 2007)). Indeed, a review of the few district court decisions in this circuit to have found an administrator's claim or defense waived shows that knowledge of the argument was readily apparent during the administrative proceedings. *See, e.g., Becknell* at *6 (denying Defendants' untimeliness argument as waived where Plaintiff's claim was filed four

years after the alleged severance event and Defendants never raised it during the administrative proceedings); *Nair*, 2009 WL 1635380, at *9 (denying Defendant's timeliness argument as waived); *Locklear*, 2015 WL 1964675, at *7 (noting in its waiver analysis that "the factual record was entirely developed at the administrative level, and neither party has referenced any facts beyond the administrative record"); *see also Glista v. Unum Life Ins. Co. of America*, 378 F.3d 113, 132 (1st Cir. 2004) (noting as a basis for finding waiver that Defendant "has taken the position that it had sufficient information to raise the Symptoms Clause during the claims review process").

Here, the administrative record does not demonstrate sufficient indicia of Defendants' knowledge of the drafting error, much less to support a viable equitable reformation argument. The minor changes made to Section 7.3 in the 2002 Restatement do not so plainly evince a drafting error, or that the change could ultimately lead an arbitrator to conclude that a surviving spouse was entitled to a 100% benefit. It was only when the Arbitrator interpreted Section 7.3 as it pertained to Counts I through III of the Amended Complaint without relying on any extrinsic evidence that Defendants' drafting error became not only apparent but potentially determinative. Moreover, and critically for purposes of the case law referenced herein, it appears that only upon engaging in discovery in connection with the subsequent litigation that Defendants realized that a drafting error had been committed. Indeed, the record presently before the Court in connection with the equitable reformation motion consists of evidence gathered by Defendants during discovery conducted in connection with the present litigation between 2018 and 2022, several years after the administrative proceedings. (*See* ECF No. 167-4 at 7, 34, 38, 48, 223.)

Plaintiff places much reliance on the First Circuit's decision in *Glista* for the proposition that Defendants waived their equitable reformation argument by failing to raise it during the administrative proceedings. 378 F.3d 113 (1st Cir. 2004). In *Glista*, the Court ruled that "plan

12

administrators [who] have available sufficient information to assert a basis for denial of benefits"
may not subsequently "choose to hold that basis in reserve rather than communicate it to the
beneficiary. Such conduct prevents ERISA plan administrators and beneficiaries from having a
full and meaningful dialogue regarding the denial of benefits." *Id.* at 129 (citing *Juliano v. The
Health Maint. Org. of N.J., Inc.*, 221 F.3d 279, 288 (2d Cir. 2000). *Glista* is inapposite here,
however, because it appears that the plan administrators did not "have available sufficient
information" to assert the scrivener's error argument as a basis for denial of benefits. Defendants'
equitable reformation argument cannot be deemed the sort of bait-and-switch or *post hoc*
justification in the vein of *Glista* and *Pacconi*. Accordingly, because the record appears to have
been too undeveloped at that time to support an equitable reformation motion, the Court finds that
ETS did not waive its motion to reform for failing to raise it during administrative review.[6]

ii.     Failure to Raise During Arbitration

The Court is similarly unpersuaded by Plaintiff's contention that Defendants waived their
equitable reformation argument by failing to raise it during arbitration. Quite simply, it appears
that neither the parties, the Arbitrator, nor the District Court considered such a claim to lie within
the initial scope of the arbitration.[7] The Arbitrator's April 30, 2018 Decision reveals much about
the parties' understanding of the limited scope of the proceedings:

> The District Court ordered arbitration of the first three counts of the
> Amended Complaint insofar as they relate to the Section of the
> 401(a) Plan. The Parties addressed in some detail the question of the
> proper interpretation and application of the Plan provisions in this
> case, but did not address in any significant way any other questions
> regarding the appropriate relief. The briefs contained no arguments

---

[6] The Court also notes that even by Plaintiff's acknowledgement, the plan administrator would lack the
power to grant the relief of equitable reformation had Defendants brought the claim during the
administrative proceedings. (ECF No. 176 at 22 (noting that Defendants, Plaintiff, and the Arbitrator all
agreed that a plan administrator cannot equitably reform an ERISA Plan).)

[7] The Court does not credit the parties' self-serving arguments in their briefs that they believed the equitable
reformation motion to be within or outside the scope of the arbitration.

regarding whether this arbitration was limited to a traditional plan claims appeal determination as to whether the denial of benefits was proper or whether the direction to arbitration by the District Court of Counts 1, 2, and 3, required that this arbitration address additional questions of the appropriate relief that is due pursuant to ERISA as a result of the improper denial of Qualified Preretirement Survivor benefits in this case. Given the failure of the parties to address this question of arbitral authority, as well as the related questions of the appropriate relief that should be awarded in the event that authority to decide fully Counts 1, 2, and 3, of the Amended Complaint was submitted for ruling in this arbitration, no ruling on these questions will be made herein at this time.

(ECF No. 86-11 at 35–36.) The Arbitrator also noted that after some initial confusion regarding

the scope of the arbitration, the "the Parties agreed to proceed with this arbitration on an individual

rather than a class basis." (ECF No. 86-11 at 14–15.)  In short, the scope of the arbitration — as

reflected in the Arbitrator's understanding of the limited scope of his authority — was confined to

interpreting the plan terms and those terms alone, and with respect to Plaintiff only. A motion to

equitably reform the ERISA plan, which would affect the entire putative class, was simply not

within the contemplated ambit of the arbitration.

The record also reflects that the District Court did not consider equitable reformation to be

within the scope of the arbitration proceedings. Following oral argument on Defendants' motion

for equitable reformation — which was filed shortly after the initial arbitration Decision was

rendered — Judge Shipp dismissed Defendants' motion to equitably reform the 401(a) Plan as

"premature" because the proceedings were still ongoing before the Arbitrator. (ECF No. 101 at

39:3–6.) The Court added that "[t]he parties may re-file a renewed motion after the arbitrator issues

a final award." (*Id.* at 39:8–9.) After the arbitrator issued its final award, Defendants again

attempted to equitably reform the Plan to clarify the 2002 amendments to Section 7.3. (ECF No.

108 at 43–45.) Plaintiff opposed, asserting that "ETS has waived any scrivener's error argument."

(ECF No. 109-1 at 18–20.) In its Opinion dated April 28, 2021, Judge Shipp "grant[ed]

Defendants' request to renew their [equitable reformation] motion." (ECF No. 111 at 10 n.5.) Defendants, in compliance with Judge Shipp's instructions, filed the instant motion pending before the Court.

In summary, the record indicates that neither the Arbitrator nor the District Court considered a motion for equitable reformation to be within the scope of the arbitration. Instead, Defendants repeatedly sought the District Court to equitably reform the Plan and filed the instant motion once more when the District Court authorized the refiling. The Court will not penalize Defendants for abiding by Judge Shipp's instruction, or for not raising an argument where the scope of the underlying proceedings was limited. For these reasons, the Court does not find Defendants' argument waived for failing to raise it during the arbitration proceedings.

Having found Plaintiff's statute of limitations and waiver arguments unavailing, the Court proceeds to the merits of Defendants' equitable reformation motion.

## C. EQUITABLE REFORMATION

As stated previously herein, the doctrine of equitable reformation of an ERISA plan is authorized as follows: "a court may correct a scrivener's error 'based upon parol evidence, provided the evidence is clear, precise, convincing and of the most satisfactory character that a mistake has occurred and that the mistake does not reflect the intent of the parties.'" *Stanford*, 2010 WL 3488651 at *9 (quoting *Murata*, 980 F.2d 889, 907-08 (3d Cir. 1992)).

In support of the merits of their motion, Defendants provided a voluminous record evidencing that the language in question was a drafting error and that Defendants never intended for the 2002 amendment to provide for a 100% QPSA benefit. The record, which is summarized below, draws from several decades of Plan restatements, supporting documents, communications to participants, declarations of in-house and outside counsel assigned to draft the 2002 amendment,

and the declaration of the former ETS Vice President who participated in the Board meetings which discussed the instant amendments.

Beginning with the drafting history, prior to the 2002 Restatement, Section 7.3 of the Plan read as follows:

> <u>Qualified Preretirement Survivor Annuity.</u> If a married Participant dies before benefits have commenced then the Participant's account balance shall be applied toward the purchase of an annuity (or other form of benefit provided under Exhibits A or B) for the life of the Surviving Spouse unless any other Beneficiary has been designated pursuant to a Qualified Election.

(Defs. Ex. A, ECF No. 167-4 at 65.) Exhibits A and B referenced in Section 7.3 refer to TIAA and CREF annuity contracts, each of which provided that a spousal survivor death benefit amounted to "the actuarial equivalent of one-half of the portion of the Accumulation." (ECF No. 167-1 at 7–8.) The Plan further stated that the TIAA and CREF annuity contracts "are considered to be an integral part of this plan." (*Id.* at 9.)

In 2002, ETS hired outside counsel to amend and restate its 401(a) Plan to comply with a set of laws collectively referred to as "GUST" and to comply with the Economic Growth and Tax Relief Reconciliation Act of 2001 ("EGTRRA"). (*Id.* at 9.) Both in-house and outside counsel charged with amending the 401(a) Plan stated that the revisions were intended to comply with the changes required by GUST and EGTRRA and nothing more. (Decl. of Michael Randall, Ex. 2 at ¶¶ 4–5, ECF No. 167-4; Decl. of Joseph Mark Poerio, Ex. 3 at ¶¶ 9–10.) Neither declarant, nor the parties in the instant litigation contend that GUST or EGTRRA affected the requirements for the QPSA benefit. Despite the limited scope, however, outside counsel mistakenly altered Section 7.3, removing the parenthetical reference to "Exhibits A or B", and inserting the phrase "determined by the Administrator." (ECF No. 167-1 at 15.)

16

Both before and after the 2002 Restatement of the 401(a) Plan, all Plan documents and communications describing the Plan consistently presented a 50% QPSA benefit. These documents include the TIAA/CREF annuity contracts and certificates, endorsements further describing those certificates, and a summary plan description ("SPD") which EBAC was required by law to provide to each Plan participant. (Defs. Ex. 4, Decl. of John Basehore, ¶¶ 16–28, ECF No. 167-4.) These communications, particularly the SPDs, were amended several times over the years — including in 1991, 2005, 2010, 2013, and 2015 — and uniformly and consistently contained the 50% QPSA language. (*Id.* at ¶¶ 18–28; *see also* ECF No. 167-1 at 17–25.)

The record further shows that only the communications, but never the Plan itself, were distributed to participants. John Basehore, who was employed by ETS and was a member of the EBAC from 2002 to 2021, stated that during his employment with ETS from 2002 to 2021, "it was not the practice of ETS, the EBAC, or TIAA to distribute copies of any Plan Documents to participants and beneficiaries in the absence by a specific written request of a participant or beneficiary." (Defs. Ex. 4, ECF No. 167-4 at 41, ¶ 10.) After the litigation commenced, ETS conducted a search to determine how many people requested the Plan documents. The search revealed that "[a]side from that one instance involving Ms. Luciano's claim for benefits, we did not identify in that search a single case in which a copy of the 401(a) Plan Document was distributed to a Plan participant or a Plan beneficiary or a lawyer for either a Plan participant or beneficiary." (*Id.* at ¶ 13.)

On February 26, 2016, approximately one year after Plaintiff filed her administrative action before the EBAC, the EBAC held a meeting and amended the 401(a) Plan. (*Id.* at ¶ 28.) The EBAC noted that it sought "to amend the 401(a) Plan to clarify that the [QPSA] payable under ERISA . . . has a value equal to 50 percent of the deceased participant's vested account balance, as has been

the case at all times since the Retirement Equity Act of 1984 first took effect with respect to the 401(a) Plan." (*Id.*) Accordingly, that day, the EBAC made an amendment to Section 7.4 of the 401(a) Plan, which stated in pertinent part: "In the event that a married Participant dies prior to his Annuity Starting Date, 50 percent of his Account Balance shall be applied to provide a Qualified Preretirement Survivor Annuity to his Surviving Spouse . . . ." (*Id.*)

Upon review of the record, the Court finds that the evidence is clear and convincing that a drafting error occurred in the 2002 Restatement of Section 7.3 of the 401(a). Further, the evidence is clear and convincing that no plan participants were likely to have relied on the drafting error. In fact, it appears that no participant or beneficiary — including Mr. Rosso (*see* ECF No. 167-4 at 254–57) — saw the Plan language containing the error. Rather, it appears that all participants construed their benefits through communications which have consistently provided for a 50% QPSA benefit. Accordingly, allowing reformation of the scrivener's error would not thwart ERISA's statutory purpose of ensuring that plan participants can rely on their expected entitlement. *See McCormick*, 85 F.3d at 1105 n.2.

With regard to Plaintiff, who appears to be the only participant or beneficiary to have seen the 2002 Plan and did so after the fact (as did the now deceased Ms. Rosso, the initial intervener in this case), it is beyond a stretch to conclude that Ms. Luciano "relied" on the drafting mistake in the Plan language in believing that she was entitled to a 100% QPSA. (*See* Am. Compl. at ¶¶ 45–49 (construing entirely different language in Section 7.3 to argue her entitlement to a 100% QPSA); Basehore Decl., ECF No. 167-4 at 254–258 (noting that a copy of the 401(a) Plan was never sent to any Plan participant or beneficiary, other than the referenced copies sent to the lawyers for Ms. Luciano and Ms. Rosso" (emphasis added)).) Nonetheless, the Arbitrator awarded Plaintiff a 100% QPSA benefit under the 401(a) Plan, (ECF No. 103-3 at 36) and that award was

confirmed in its entirety by the District Court (ECF No. 112). Those decisions are unaffected by this Court's decision here, and accordingly Plaintiff shall remain entitled to a 100% QPSA benefit.

Plaintiff, in opposition, does not cite evidence which contradicts Defendants' proofs regarding the Plan, the drafting history, the communications, and the likelihood that participants relied on the error. Instead, Plaintiff argues that the drafting error was unilateral on the part of Defendants and that a unilateral mistake may not be reformed through the scrivener's error doctrine unless it was founded in fraud. (ECF No. 176 at 38.) The Court disagrees that Third Circuit precedent requires mutuality or fraud as a prerequisite to an equitable reformation claim under ERISA. *Murata*, in announcing this Court's rule on equitable reformation of ERISA claims, made no reference to either mutual mistake or fraud. *McCormick* restated *Murata*'s "central holding" as allowing equitable reformation as long as one party establishes that "no plan participants were *likely* to have relied upon the scrivener's error in question." 85 F.3d at 1105 n.2 (emphasis added). Thus, again, the Third Circuit did not incorporate a mutuality or fraud requirement. Subsequent courts to interpret *Murata* and *McCormick* have either expressly or impliedly rejected the finding that mutuality or fraud are a prerequisite to an equitable reformation claim. *See Stanford*, 2010 WL 3488651, at *9 (finding Plaintiff's imputation of mutuality as a precondition "incorrect under *Murata* and *McCormick*"); *Waters*, 2020 WL 7841163, at *5 (considering only Defendants' intent and Plaintiff's likelihood of reliance on the error but not mutuality or fraud).

Plaintiff's argument that the "law of the case" established that the communications did not provide for a 50% QPSA is also unavailing. The Arbitrator's decision made very clear that it did not consider any evidence outside the Plan language. (ECF No. 176-1 at 81–83.) Judge Shipp, when confirming the Arbitrator's decision, merely observed that "the Arbitrator set forth in detail the reason why prior practice and administration, extrinsic ambiguity, and donative intent were not

applicable to the instant matter." (ECF No. 111 at 8.) Neither decision has any bearing on Defendants' equitable reformation claim, which inherently must rely on "parol evidence" outside the Plan to substantiate its claim. *Murata*, 980 F.2d at 907–08 (considering evidence outside the Plan documents and noting that the "rigorous test for establishing a scrivener's error" would require "additional evidence" and factfinding on remand); *Stanford*, 2010 WL 3488651, at *10–11 (considering communications between the parties, meeting minutes, and deposition testimony); *Waters*, 2020 WL 7841163, at *5 (considering internal memoranda, several years of restatements, and SPDs).

Accordingly, the Court finds that Defendants have met their burden of showing by clear and convincing evidence that a drafting error occurred in Section 7.3 of the Plan and that no Plan participants were likely to have relied on the error in construing their benefits. Therefore, the Court will allow Defendants to equitably reform Section 7.3 of the 2002 Restatement of the 401(a) Plan to more clearly reflect an intent to provide a 50% QPSA benefit. The Court reiterates that this ruling does not disturb the Arbitrator's decision to award Plaintiff a 100% QPSA benefit under the 401(a) Plan. (ECF No. 103-3 at 36.) That award entered by the Arbitrator was confirmed in its entirety by the District Court on April 28, 2021 (ECF No. 112) and remains in full force.

## IV.     CONCLUSION

For the reasons set forth herein, Defendants' motion to reform the ETS 401(a) retirement plan is GRANTED. An appropriate Order accompanies this Opinion.

ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

Dated: July 26, 2023