COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
Matthew F. Gately
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
(201) 845-9600 (telephone)
(201) 845-9423 (fax)
mfg@njlawfirm.com
*(Additional Counsel on Signature Page)*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LORRAINE H. LUCIANO, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA - COLLEGE RETIREMENT EQUITIES FUND, et al.,<br><br>Defendants. | Civil Action No.: 3:15-cv-06726 |

**PLAINTIFF'S RESPONSE TO TIAA'S RULE 56.1 STATEMENT OF
UNDISPUTED MATERIAL FACTS IN SUPPORT OF
TIAA'S MOTION FOR SUMMARY JUDGMENT**

**REDACTED**

1.      Educational Testing Service (ETS) is an employer that sponsored two retirement plans for its employees: the Educational Testing Service 401(a) Retirement Plan (the "ETS 401(a) Plan") and the Educational Testing Service 403(b) Match Plan (as Amended and Restated Effective July 1, 2007, and later amendments) (the "ETS 403(b) Plan" or "Plan") (collectively, the "ETS Plans"). ECF No. 40-4 (Plaintiff SUMF ¶ 4). Each of the ETS Plans was established pursuant to a plan document and is an ERISA-governed employee pension plan. Ex. 1 (ETS 403(b) Plan Document).

**Plaintiff's Response:**      Admitted.


2.      The ETS Employee Benefits Administration Committee (the "EBAC") serves as the Plan Administrator for the ETS 403(b) Plan. Ex. 1 (ETS 403(b) Plan Document § 13.3); ECF No. 27 ¶ 3; Ex. 2 (3/13/15 TIAA Ltr. at 1).

**Plaintiff's Response:**      Admitted that EBAC was initially named as the Plan Administrator.  Denied that EBAC was solely responsible for administering the 403(b) Plan.  Pursuant to §§ 13.1 and 13.2 of the 403(b) Plan (and 29 U.S.C. § 1002) additional entities can assume fiduciary responsibilities and/or be delegated duties and responsibilities as to the Plan.  Section 13.1 is titled "Duties and Responsibilities of Fiduciaries; Allocation of Responsibility Among Fiduciaries."  Leiwant Cert., Ex. 1, § 13.1.  This section makes it clear there would be multiple fiduciaries administering the Plan.  In identifying the fiduciaries, § 13.1 expressly identifies the "Insurer and the Mutual Fund Custodians."  *Id.*  There can be no dispute that TIAA is an "Insurer" as that term is defined in § 1.28.  Further, § 13.1 also includes as a fiduciary "any other entity designated by the Administrator."  TIAA has admitted that it was delegated certain responsibilities for the 403(b) Plan, including to "review and make benefit

determinations[,]" which required it "to interpret plan language." *See* Defs.' 56.1 Response, ECF 51-7 ¶ 3. Indeed, TIAA elsewhere in the litigation attempted to affirmatively use the discretion delegated to it to try to avoid liability. ECF 30-1, at 20.

3.    The ETS 403(b) Plan provides that retirement benefits will be funded by the purchase of annuity contracts issued to each individual participant in the Plan under which contributions to the Plan are invested. Ex. 1 (ETS 403(b) Plan Document, Preliminary Statement, § 1.4).

**Plaintiff's Response:**    Admitted.

4.    TIAA is a financial services organization that specializes in providing financial retirement services in the academic and medical fields. ECF No. 40-4 (Plaintiff's Statement of Undisputed Material Facts ("Plaintiff's SUMF") ¶ 1); Ex. 3 (Who we serve | TIAA, https://www.tiaa.org/public/plansponsors/who-we-serve, last accessed on Oct. 24, 2024); Ex. 4 (Plan Sponsors | TIAA https://www.tiaa.org/public/plansponsors, last accessed on Oct. 24, 2024).

**Plaintiff's Response:**    Admitted.

5.    TIAA issued individual annuity contracts to fund participant benefits under the ETS Plans, including to James Rosso. ECF No. 40-4 (Plaintiff's SUMF ¶ 2); Ex. 5 (Rosso 403(b) TIAA contracts B6499160); Ex. 6 (Rosso 403(b) CREF Contract /Q6499167) (Exhibits 6 & 7, collectively the "Contracts").

**Plaintiff's Response:**    Admitted that the TIAA defendants issued these Annuity Contracts and the specifically referenced above are Jim's Annuity Contracts. Denied that the Annuity Contracts were issued by specific defendant Teachers

Insurance and Annuity Association of America.  Indeed, Ex. 6 was issued by defendant College Retirement Equities Fund.

6.    Section 14.10 of the ETS 403(b) Plan incorporates the TIAA individual annuity contracts into the Plan. Ex. 1 (403(b) Plan § 14.10).

**Plaintiff's Response:**    Denied.  Section 14.10 actually states that the "Terms and conditions of the Individual Agreements are hereby incorporated by refence into the Plan, **excluding those terms that are inconsistent with the Plan** or Code Section 403(b)."[1]  This comports with the 403(b) Plan's preliminary statement, which makes clear that to the extent there is a conflict between the Plan itself and a "Frozen Contract," the Plan will control.  403(b) Plan, Ex. 1 to Leiwant Cert., at LD1-08426. This is consistent with federal law.  *See* Internal Revenue Manual §§ 4.72.13.7(5), 4.72.13.7.7(6), 4.72.13.9.4(3) (Nov. 12, 2014) (stating that when a plan conflicts with the annuity contract, the plan will control).

7.    As Plan Administrator, the EBAC is vested with the power "to construe and interpret the Plan, and to decide all questions of eligibility for any benefits," including the discretion to interpret or construe "ambiguous, unclear or implied (but omitted) terms in any fashion it deems to be appropriate in its sole judgment." Ex. 1 (403(b) Plan §§ 13.3, 13.7(a), 13.13).

---

[1] Unless otherwise noted, all emphasis is added and, as to any legal citation, all internal quotations and citations are omitted.

**Plaintiff's Response:**    Plaintiff admits that §13.7 states that it grants certain "duties and powers" to "The Administrator."  Plaintiff denies that EBAC was solely responsible for administering the plan or was the only entity delegated the authority to decide benefit questions or construe plan terms.  Pursuant to Sections 13.1 and 13.2 of the 403(b) Plan (and 29 U.S.C. § 1002) additional entities can assume fiduciary responsibilities and/or be delegated duties and responsibilities as to the Plan.  Section 13.1 is titled "Duties and Responsibilities of Fiduciaries; Allocation of Responsibility Among Fiduciaries."  Leiwant Cert., Ex. 1, § 13.1.  This section makes it clear there would be multiple fiduciaries administering the Plan.  In identifying the fiduciaries, § 13.1 expressly identifies the "Insurer and the Mutual Fund Custodians."  *Id.*  There can be no dispute that TIAA is an "Insurer" as that term is defined in § 1.28.  Further, § 13.1 also includes as a fiduciary "any other entity designated by the Administrator." TIAA has admitted that it was delegated certain responsibilities for the 403(b) Plan, including to "review and make benefit determinations[,]" which required it "to interpret plan language."  *See* Defs.' 56.1 Response, ECF 51-7 ¶ 3.  Indeed, TIAA elsewhere in the litigation attempted to affirmatively use the discretion delegated to it to try to avoid liability.  ECF 30-1, at 20.

TIAA's Decision makes clear that it believed it had the authority to interpret plan provisions.  In deciding Lorraine's claim under the 403(b) Plan, TIAA did more than just examine the text of the Plan, instead determining what it thought was a

"reasonable" and "unreasonable" construction of same. Leiwant Cert., Ex. 2, at 6. TIAA then proceeded to determine that while § 8.2 of the 403(b) Plan expressly provides that it "applies to all Participants", based upon what TIAA believed to have been ETS's intent behind that provision, it would not apply it to Lorraine's claim. *Id.* at 6-7. TIAA then decided to go beyond the Plan itself and look to external evidence (summary plan descriptions, beneficiary designation forms, communications) to justify its initial decision to simply employ its uniform policy of assigning a 50%. *Id.* at 7-8.

Plaintiff also denies that any defendant was permitted, under ERISA, to "interpret" plan provisions in contradiction to their unambiguous meanings. *See* Plaintiff's Memorandum of Law in Opposition to ETS's Motion for Summary Judgment, Section III.B-E.

8.    The ETS 403(b) Plan authorizes the EBAC to delegate certain duties, including the determination of initial claims for benefits, to other persons. Ex. 1 (ETS 403(b) Plan Document §§ 13.1-13.3).

**Plaintiff's Response:**    Admitted.

9.    ETS delegated to TIAA the determination of initial claims for benefits and the distribution of benefits due under the ETS Plans and the Contracts. Ex. 1 (ETS 403(b) Plan §§ 13.1-13.3); ECF No. 40-4 (Plaintiff's SUMF ¶ 31); Ex. 7 (TIAA Resp. to Rog. 10); Ex. 3 (3/13/15 TIAA Ltr. at 1).

**Plaintiff's Response:**    Admitted that ETS delegated, *inter alia*, the duty and

responsibility to make initial benefit determinations to TIAA. Denied that TIAA's responsibilities were limited to only making initial benefit determinations. *See, e.g.*, Leiwant Cert., Ex. 8; Gately Cert., Ex. 13.

10. The ETS 403(b) Plan imposes comprehensive, mandatory claims procedures. Ex. 1 (ETS 403(b) Plan § 13.5).

**Plaintiff's Response:** Admitted that § 13.5 is the "Claims Procedure" provision of the 403(b) Plan. Denied that these provisions are "comprehensive," in that the 403(b) Plan (unlike the 401(a) Plan) does not contain an arbitration clause. As to whether these provisions are "mandatory," this is an irrelevant question of law that need not be either admitted or denied, especially since TIAA is not contending that Lorraine did not comply with § 13.5. That said, at one point, TIAA suggested it could "waive the requirement of filing an Appeal with the Plan." *See* Gately Cert., Ex. 13.

11. Any Participant or Beneficiary under the ETS 403(b) Plan ("Claimant"), may file a written claim for a Plan benefit with the Administrator or with a person named by the Administrator to receive claims under the Plan. Ex. 1 (ETS 403(b) Plan § 13.5(a)).

**Plaintiff's Response:** Admitted.

12. All appeals from initial claim determination go to the "Administrator" (EBAC). Ex. 1 (ETS 403(b) Plan §§ 1.3, 13.3, 13.5(c)). Thus, the Plan gives "the Administrator," the EBAC, the authority to decide the appeal of a benefit claim.

Ex. 1 (ETS 403(b) Plan § 13.5(c)).

**Plaintiff's Response**:    Denied. At one point, TIAA asserted that it could "waive the requirement of filing an Appeal with the Plan." *See* Gately Cert., Ex. 13.



13.    TIAA's authority with respect to an initial benefits determination ceases once a claim has been escalated to the EBAC via an appeal; TIAA has no authority to override the EBAC's decision on an appeal. Ex. 1 (ETS 403(b) Plan § 13.5(c)).

**Plaintiff's Response**:    Denied that TIAA's obligations or responsibilities "cease[]" after it issued its Decision.  As a mater of law, an ERISA fiduciary can be liable for a breach of duty by a co-fiduciary in several circumstances, including when the fiduciary participates in the breach by the co-fiduciary, has enabled the co-fiduciary to commit a breach, or knows of a breach by the co-fiduciary and fails to take steps to remedy that breach.  29 U.S.C. § 1105.  ETS clearly relied upon TIAA's "consistent administrative practice throughout many years of Plan administration," as well as on TIAA's "position as articulated in its written decision" when affirming TIAA's determination.  ETS Decision, Leiwant Cert., Ex. 17, at 6.

14.    The service agreement between ETS and TIAA states that the duties "█████████████████████████████████████████████." Ex. 8 (Recordkeeping Services Agreement § 2).

**Plaintiff's Response**:    Admitted that this language appears in the referenced document.  Denied that the language of Recordkeeping Services Agreement has any relevance as a matter of law. *See* Plaintiff's Memorandum of Law in Opposition to

TIAA's Motion for Summary Judgment, at Section II.B.1.

15.    The service agreement further states that " ████████████████████ ████████████████████████████████████████ ." Ex. 8 (Recordkeeping Services Agreement § 2).

**Plaintiff's Response:**    Admitted that this language appears in the referenced document.  Denied that the language of the Recordkeeping Services Agreement has any relevance as a matter of law.  Denied that the language of Recordkeeping Services Agreement has any relevance as a matter of law.  *See* Plaintiff's Memorandum of Law in Opposition to TIAA's Motion for Summary Judgment, at Section II.B.1.

TIAA has admitted that it exercised discretion when deciding Lorraine's claim.  For example, early in the case TIAA admitted that "as to the ETS Plans", TIAA would "review and make benefit determinations[,]" which required it "to interpret plan language."  *See* ECF 51-7 ¶ 3.  Additionally, even a cursory review of TIAA's Decision demonstrates that TIAA was doing more than mechanically applying plan language to Plaintiff's appeal.  Leiwant Cert., Ex. 2.  Indeed, earlier in this case, TIAA attempted to escape liability based upon the discretion it had been delegated.  ECF 30-1, at 20.

It is also clear that when TIAA was making these decisions, it was doing so pursuant to its own policies & procedures.  *See* Leiwant Cert., Exs. 23-24.  These policies & procedures called for a two-step process, wherein a "researcher" would

conduct an initial review, which would then be reviewed by the BRT's "quality control" team. Gately Cert., Ex. 7, 30:14-18. TIAA would not only review documents it had on file, *id.* at 138:18-25, but would conduct independent research to determine, *inter alia*, the existence of a spouse of a deceased participant by reviewing obituaries (which was a multi-step process). *Id.* at 37:14-25, 101:20-102:2. TIAA's BRT would also send and review marital status verification forms and spousal waivers. *Id.* at 36:8-19,148:4-24, 153:4-20.

16.     Plaintiff's late husband, James T. Rosso, was an employee of ETS from 1979 until 1993 and a participant in the ETS Plans until the time of his death on April 11, 2014. ECF No. 40-4 (Plaintiff SUMF ¶¶ 6, 25); ECF No. 3 (Amended Complaint "AC") ¶¶ 40-44; Ex. 2 (3/13/15 TIAA Ltr. at 2).

**Plaintiff's Response:**     Admitted.

17.     In 1980, Mr. Rosso enrolled in the 401(a) Plan and designated his now-deceased father and mother, Joseph Rosso and Grace Rosso, as his beneficiaries. Ex. 9 (1980 Beneficiary Designation, LD1-08491); Ex. 2 (3/13/15 TIAA Ltr. at 2).

**Plaintiff's Response:**     Admitted.

18.     In 1988, Mr. Rosso enrolled in the 403(b) Plan, naming his now-deceased sister, Lucille Rosso ("Ms. Rosso"), as beneficiary. Ex. 2 (3/13/15 TIAA Ltr. at 2); Ex. 10 (1988 Beneficiary Designation, LD1-08493).

**Plaintiff's Response:**     Admitted.

19.    In 1996, Mr. Rosso elected to transfer the portion of his ETS Plan accounts held in TIAA fixed-type retirement annuity contracts to his CREF retirement- annuity certificates. Ex. 2 (3/13/15 TIAA Ltr. at 3).  Due to TIAA contract liquidity restrictions, those interfund transfers took place gradually over a ten-year period via a TIAA Traditional Transfer Payout Annuity issued to Mr. Rosso. Ex. 2 (3/13/15 TIAA Ltr. at 3).  The interfund transfers were completed in July 2006. Ex. 2 (3/13/15 TIAA Ltr. at 3).

**Plaintiff's Response:**    Admitted.

20.    The transfer process involved Mr. Rosso applying for and being issued two new TIAA contracts, and designating beneficiaries for those contracts. Ex. 2 (3/13/15 TIAA Ltr. at 3).

**Plaintiff's Response:**    Admitted.

21.    Mr. Rosso designated Ms. Rosso as sole beneficiary for both TIAA Transfer Payout Annuity contracts issued when he moved his funds in each of the ETS Plans from TIAA contracts to CREF Contracts. Ex. 2 (3/13/15 TIAA Ltr. at 3); Ex. 11 (1996 designation related to ETS 403(b) Plan, LD1-08500); Ex. 12 (1996 designation related to ETS 401(a) Plan, LD1-08497); AC ¶ 52.

**Plaintiff's Response:**    Admitted.

22.    By the date of his death, Mr. Rosso's entire interest under the 403(b) Plan was held in the CREF Contract. Ex. 2 (3/13/15 TIAA Ltr. at 3).

**Plaintiff's Response:**    Admitted.

23.    The Contracts issued to Mr. Rosso contain provisions under which the participant may name beneficiaries to whom his plan benefit will be paid if he dies prior to his annuity start date. Ex. 5 (TIAA Contract §§ 9, 19); Ex. 6 (CREF Contract

§§ 9, 21).

    **Plaintiff's Response**:    Admitted.

24.    The Contracts contain provisions under which a participant is permitted to change his named beneficiary. Ex. 5 (TIAA Contract §§ 16, 20, 30); Ex. 6 (CREF Contract §§18, 22, 32).

    **Plaintiff's Response**:    Admitted.

25.    The Contracts also contains a provision for a spouse's survivor death benefit, which states that if the contract holder is married at death, and the spouse is not explicitly named as a beneficiary and no spousal waiver has been executed, the spouse will receive a payment of 50% of the account proceeds and the non- spouse named beneficiaries will receive a payment of the other 50% of the account proceeds. Ex. 5 (TIAA Contract at 31); Ex. 6 (CREF Contract at 23).

    **Plaintiff's Response**:    Denied.  The language upon which TIAA relies is contained in a 1985 endorsement to all TIAA Annuity Contracts (the "1985 Endorsement").

As the Arbitrator already found, the 1985 Endorsement (which is identical for Jim's Annuity Contracts under both the 401(a) and 403(b) Plans) does **not** set a 50% QPSA. Defendants improperly read one part of the 1985 Endorsement in isolation, ignoring the fact that this language that contains a condition precedent (*i.e.*, a trigger). As the 1985 Endorsement's preamble makes clear, its purpose is "to conform" the TIAA and CREF Annuities "to the requirements of" ERISA/REA. *See* Leiwant Cert., Ex. 5 (TIAA Contract at 31); Ex. 6 (CREF Contract at 23). As such, the relevant

Section 3 of the 1985 Endorsement provides:

> **SPOUSE'S RIGHT TO BENEFITS**
>
> If all or part of your Accumulation is attributable to contributions made under a retirement plan or tax-deferred annuity plan subject to ERISA and a plan contribution has been paid on your behalf after August 22, 1984, then, **only to the extent required by** the [Internal Revenue Code] or **ERISA**, your rights to choose an Income Option and to name a beneficiary for the Death Benefit are subject to your spouse's right, if any, to benefits as follows:
>
> . . . .
>
> **Spouse's Survivor Death Benefit.**  If you die before the Annuity Starting Date and you are then married, the payment of the Death Benefit to your named beneficiary is subject to your spouse's right to receive a Death Benefit of an annuity which is the actuarial equivalent of one-half of the portion of the Accumulation, if any, attributable to contributions made under a plan subject to ERISA, provided a plan contribution has been paid after August 22, 1984.  Your spouse's right to a Survivor Death Benefit may be waived, in form satisfactory to TIAA, with your spouse's written consent . . . .

*Id.*  Thus, while Defendants direct the Court to the paragraph titled "Spouse's Survivor Death Benefit," Defendants fail to recognize that this provision applies "**only to the extent required**" by ERISA/REA.  Here, because the 403(b) Plan provides for a 100% QPSA, the Plan complies with ERISA and the condition precedent is not triggered. *See Collins v. Ralston Purina Co.*, 147 F.3d 592, 600 (7th Cir. 1998) (noting, in the context of an ERISA dispute, that a court "cannot rewrite the parties' agreement to eliminate an important condition precedent").

This is exactly what the Arbitrator concluded: "As drafted, the language of the

annuity contract endorsement appears to ensure that there is a floor that ensures that the requirements of REACT are met, but has not been shown to constitute a ceiling that purports to invalidate other clear Plan language that would grant surviving spouses rights to survivor benefits greater than would be derived from a 50% formula." Gately Cert., Ex. 2, Initial Award at 30.

26.     The Contracts provide that a spouse can waive the spouse's survivor death benefit. Ex. 5 (TIAA Contract at 31); Ex. 6 (CREF Contract at 23).

**Plaintiff's Response:**     Admitted.

27.     Mr. Rosso passed away prior to his annuity start date. ECF No. 40-4 (Plaintiff SUMF ¶ 26).

**Plaintiff's Response:**     Admitted.

28.     Mr. Rosso married Plaintiff in 2004. ECF No. 40-4 (Plaintiff SUMF ¶ 25).

**Plaintiff's Response:**     Admitted.

29.     Following his marriage, Mr. Rosso did not change his beneficiary designation under the Contracts issued to fund his benefits under the ETS 403(b) Plan. Ex. 2 (3/13/15 TIAA Ltr. at 3); Ex. 13 (6/11/14 Demaree Ltr., LD1-08158).

**Plaintiff's Response:**     Admitted.

30.     The ETS 403(b) Plan provides for rights to benefits for surviving spouses

of participants such as Mr. Rosso. Ex. 1 (ETS 403(b) Plan § 8.4).

**Plaintiff's Response:**    Admitted.


31.    Specifically, the ETS 403(b) Plan provides that if a married participant dies before benefits have commenced, "the Surviving Spouse of the Participant may elect to have the Participant's Account Balance converted into an Annuity Contract for the life of the Surviving Spouse ('Qualified Preretirement Survivor Annuity'), unless any other Beneficiary has been designated pursuant to a Qualified Election." Ex. 1 (ETS 403(b) Plan § 8.4). The ETS 403(b) Plan further provides, through the Contracts incorporated into the Plan, that the surviving spouse benefit is a 50% benefit, with the designated beneficiary receiving the other 50%. Ex. 5 (TIAA Contract at 31); Ex. 6 (CREF Contract at 23).

**Plaintiff's Response:**    Admitted as to the first sentence.  Denied as to the second

sentence.  First, as the Arbitrator already found the 1985 Endorsement does <u>not</u> set a

50% QPSA.  *See* Gately Cert., Ex. 2, Initial Award at 30.  Second, Section 14.10 of

the 403(b) Plan provides that the "Terms and conditions of the Individual Agreements

are hereby incorporated by refence into the Plan, **excluding those terms that are**

**inconsistent with the Plan** or Code Section 403(b)."  403(b) Plan, Ex. 1 to Leiwant

Cert. § 14.10.  This also comports with the 403(b) Plan's preliminary statement,

which makes clear that to the extent there is a conflict between the Plan itself and a

"Frozen Contract," the Plan will control.  403(b) Plan, Ex. 1 to Leiwant Cert., at LD1-

08426.  Because the 403(b) Plan "on its face" provides for a 100% QPSA, if the 1985

Endorsement provided for a 50% QPSA, then the 1985 Endorsement would not be

incorporated into the plan.  Third, even if the annuity contracts were incorporated by

reference, the language within the plan document would still control as a matter of federal law. *See* Internal Revenue Manual §§ 4.72.13.7(5), 4.72.13.7.7(6), 4.72.13.9.4(3) (Nov. 12, 2014) (stating that when a plan conflicts with the annuity contract, the Plan will control).

Finally, TIAA (as was the case in its Decision) fails to acknowledge that "Account Balance" is defined as "[t]he bookkeeping account maintained for each Participant which reflects **the aggregate amount** credited to the Participant under all Accounts, including . . . the earnings or loss of each Annuity Contract." Leiwant Cert., Ex, 1 at § 1.2. As a matter of law, this definition must govern. *See* Plaintiff's Memorandum of Law in Opposition to ETS's Motion for Summary Judgment, Section III.C.

32.    In June 2014, TIAA learned that Plaintiff was Mr. Rosso's surviving spouse. Ex. 2 (3/13/15 TIAA Ltr. at 3); Ex. 14 (6/4/14 Ltr. from TIAA, LD1- 07754).

**Plaintiff's Response:**     While TIAA was notified that Lorraine was Jim's Surviving Spouse via telephone in May 2014, for purposes of this motion, Plaintiff admits that by June 2014, TIAA had learned of this fact.

33.    On June 30, 2014, TIAA apprised Plaintiff that, as Mr. Rosso's surviving spouse, she was entitled to benefits under both of the ETS Plans in the total amount of $119,253.33. Ex. 15 (6/30/14 Ltr. from TIAA, LD1-02871).

**Plaintiff's Response:**     Admitted.

34.    The amount of $119,253.33 represented half of Mr. Rosso's account balance in the ETS Plans. Ex. 2 (3/13/15 TIAA Ltr. at 3).

**Plaintiff's Response:**    Admitted.

35.    TIAA apprised Plaintiff that the remaining 50% of Mr. Rosso's account balance would be distributed to Mr. Rosso's named beneficiary, Lucille Rosso. Ex. 2 (3/13/15 TIAA Ltr. at 4-9); AC ¶ 59.

**Plaintiff's Response:**    Admitted.

36.    Plaintiff asserted a claim to the entire amount of Mr. Rosso's account balance according to the claims procedures of the ETS 403(b) Plan. Ex. 2 (3/13/15 TIAA Ltr. at 1 and n.2); Ex. 13 (6/11/14 Demaree Ltr., LD1-08158); Ex. 16 (6/18/14 Ltrs., LD1-08160).

**Plaintiff's Response:**    Admitted.

37.    On March 13, 2015, TIAA formally denied Plaintiff's claim for more than 50% of Mr. Rosso's account balance. ECF No. 40-4 (Plaintiff SUMF ¶ 32); Ex. 2 (3/13/15 TIAA Ltr.).

**Plaintiff's Response:**    Admitted.

38.    TIAA based its conclusion on Sections 8.4 and 14.10 of the ETS 403(b) Plan and the Spouse Survivor Death Benefit Provision of the Contracts. Ex. 2 (3/13/15 TIAA Ltr. at 8).

**Plaintiff's Response:**    Denied.   On its face, TIAA's Decision references

sections other than §§ 8.4 and 14.10 of the 403(b) Plan.  Leiwant Cert., Ex. 2, at 7 (purporting to examine §§ 8.1 and 8.2).  Additionally, TIAA references extrinsic evidence in addition to the Annuity Contacts, such as summary plan descriptions, Jim's beneficiary designations, and the history of the 403(b) Plan's amendments.  *Id.* at 3-8.

In any event, discovery has demonstrated that TIAA's Decision was a *post hoc* effort to justify its initial decision to always assign a 50% QPSA, regardless of what the plan document required.   After Jim's death, the initial beneficiary letters sent to Lorraine appear to be form documents generated by TIAA and not specific to the two plans at issue.  *See* Studholme Cert., Ex. A.  When Lorraine realized that TIAA was assigning her a QPSA funded with only 50% of Jim's Account Balances, she objected. *Id.* at ¶ 9.  In response to this objection, TIAA's Associate General Counsel, Ms. Byrne, sent an email setting forth TIAA's reasoning for awarding only a 50% QPSA. *See id.*, Ex. B.  TIAA did not base its conclusion on the language of the governing plan documents, but instead on caselaw dealing with completely different ERISA plans sponsored by entities other than ETS that contained different plan language.  *Id.* Thereafter, TIAA sent a series of emails demonstrating that TIAA could not have consulted the actual plan documents, as it did not even know what the governing plan documents were, with TIAA first sending the 403(b) Plan and claiming it governed all of Jim's benefits and then, months later, sending the 401(a) Plan and claiming that

it governed all of Jim's benefits.  Studholme Cert. ¶¶ 11-12, Ex. C-D.

Indeed, the issue of TIAA's policy for making QPSA determinations was directly addressed in a telephone call between Ms. Byrne and Lorraine's counsel, Anne Studholme, Esq.  As Ms. Studholme explains:

> 15.    When communicating with Ms. Byrne, I candidly disclosed that I was researching a potential class action and made clear that I was focused on whether providing a "one half" QPSA was indeed a universal practice of TIAA, regardless of the language in the Plan.
>
> 16.    Ms. Byrne confirmed that it was.  She said, "We always do it this way."  Under the circumstances, I was pleasantly surprised by her candor.  She said that no one had ever asked, as Mr. Demaree and I were asking, to review the controlling Plan document in representing a beneficiary claiming a contested QPSA.

Studholme Cert. ¶¶ 15-16; *see also* Gately Cert. Ex. 10, Plaintiff's Response to TIAA's Interrogatories, Response to Interrogatory Nos. 11 ("Due to Ms. Byrne's statements, it became clear that that I was not the only person in this position: relying on a benefit I was entitled to as the wife of a person who died while still employed and covered by one or more of the Defendants' plans, but which the Defendants refused to pay, even in the absence of the required spousal waiver."), No. 14.  Indeed, Ms. Byrne at one point claimed the Plan was not even relevant because a plan document "generally goes to operation of the Plan as a whole" while other documents, like Annuity Contracts, define beneficiary entitlements.  *See* Gately Cert., Ex. 13.  This incorrect understanding comports with subsequent correspondence from Ms. Byrne suggesting

that TIAA's improper practice of always assigning a 50% QPSA potentially derived from the fact that TIAA, following REACT's passage, added the 1985 Endorsement to all of its Annuity Contracts, which TIAA incorrectly assumed would mandate a 50% QPSA in all situations.  *See* Studholme Cert. ¶¶ 17-18, Ex. E.  It is logical to assume that TIAA, after adding the 1985 Endorsement to every Annuity Contract and incorrectly reading the 1985 Endorsement as always mandating a flat 50% QPSA, would thereafter uniformly assign a 50% QPSA in all circumstances, even when the plan document provided otherwise.  Indeed, TIAA expressly warned its clients that it would be making benefit determinations based upon the terms of the Annuity Contracts (including the 1985 Endorsement), **not** the terms of the plan itself:

> **Since the relationship between TIAA-CREF and plan participants is governed by the terms of the annuity contract or certificate, benefits will be determined by the terms of the contract or certificate." It is therefore, essential that plan sponsors ensure that there is no conflict between the terms of the written plan and the terms of the [annuity contracts] used as funding vehicles.**

*See* Gately Cert., Ex. 12, at 2-3.[2]  TIAA's statement would make no sense if TIAA's policy at the time was to follow plan language when calculating QPSA percentages. TIAA's statement, however, is completely consistent with Ms. Byrne's admissions.

In fact, at one point early in the litigation, TIAA resurrected this argument, contending that it was legally bound to distribute benefits in accordance with the

---

[2] If anything, TIAA was putting the onus on its clients to revise their plan documents to comply with TIAA's Annuity Contracts.

annuity contracts' terms. *See* TIAA Reply Br., ECF 51, at 8-9 ("First, it is well established that an insurer must comply with the terms of its agreements. The fact that the insurer's contract is issued in connection with an employee benefit plan does not negate the insurer's contractual obligations. **Accordingly, TIAA is required to pay contractual benefits under the terms of the contracts.**"). If TIAA truly believed— as it represented to the Court—that it was required to pay benefits according to the uniform terms of the annuity contracts issued to every participant regardless of the governing plan's terms, it would make no sense for TIAA to be reviewing plan documents when calculating QPSA percentages, as it now, in the wake of this litigation, claims to do.

Further, it appears that in the pre-litigation period, TIAA misunderstood the QPSA requirement created by the REA. As set forth in a TIAA 2008 beneficiary notice, TIAA incorrectly advised federal law provided that only 50% of benefits had to go to a Surviving Spouse and the "other 50% can go to any beneficiary that you choose." *See* 2008 Notice, Ex. 11 to Gately Cert., at 2. TIAA does not qualify this statement by taking into consideration that the Participant's plan document could set the QPSA at a higher level.[3] The fact that TIAA mistakenly believed that the REA set

_____

[3] To be clear, federal law does not set the QPSA at 50% in all circumstances. Instead, 29 U.S.C. § 1055(e)(2) provides that a Surviving Spouse is entitled to a QPSA "which is **not less than** 50 percent of the portion of the account balance of the participant." While this definition sets a floor—the actuarial equivalent of a QPSA must be at least fifty percent of a Participant's Account Balance—it does not set a

the QPSA at exactly 50% may also help explain why TIAA adopted a uniform policy of always assigning a 50% QPSA.

To contradict the foregoing, TIAA provides the Court with its post-litigation policies & procedures, but these documents cannot show what TIAA's policy was when it decided Lorraine's claim.  TIAA did, however, produce older policy & procedure documents in discovery, which confirm Ms. Byrne's admission that TIAA would—prior to the litigation—uniformly assign a 50% QPSA.

As TIAA's corporate representative explained, beneficiary determinations are handled by TIAA's BRT, and consist of an initial review by a "researcher," which is then verified by the BRT's "quality control" team.  Gately Cert., Ex. 7, at 30:14-18. TIAA submits the 2021 version of the policy & procedure document governing the secondary QC process (the "QC Beneficiary Research Policy").  *See* Leiwant Cert., Ex. 23.  While TIAA did not produce the pre-litigation version of that policy, it did produce an earlier version (effective June 2016).  *See* Gately Cert., Ex. 9.  Comparing the 2016 and 2021 versions demonstrates that TIAA's policies have markedly changed over time, especially when it comes to QPSAs.  For example, the specific step upon which TIAA relies in its statement of facts is "10. Review the Survivor Benefits Service section." In the 2021 version of the policy, there is an image showing four

_____

ceiling.  Thus, a QPSA can be from 50% to 100% of a Participant's Account Balance, depending upon the terms of the plan.  *See* Plaintiff's Memorandum of Law in Opposition to ETS's Motion for Summary Judgment, Section III.C.

different specific questions/responses for each plan including, "Does the plan stipulate a minimum spousal pre-retirement death benefit percentage? ('QPSA')". Ex. 23 to Leiwant Cert at TIAA-LL_00011042. The 2016 version of the document, however, contains only 2 of the 4 questions. Critically, the question/response dealing with a specific QPSA percentage is **missing** from the 2016 version. *See* Gately Cert., Ex. 9 at TIAA-LL_00010306. Additionally, the 2016 version of the QC Beneficiary Research Policy is missing other steps that appear in the 2021 version, such as instructing TIAA employees to review "Special Policy Text Rules." *Compare* Ex. 23 to Leiwant Cert. at TIAA-LL_00011041 *with* Gately Cert., Ex. 9 at TIAA-LL_00010303-07. For purposes of determining the supposedly proper QPSA percentage, the only guidance provided by the 2016 version is the following:

> For ERISA governed schools with post-84 monies for the participant, locate the spousal waiver and confirm the spouse has signed it or not. **If the participant was married, the spouse is entitled to <u>50%</u> and must sign the waiver.**

*See* Gately Cert., Ex. 9 at TIAA-LL_00010302.

TIAA did produce its pre-litigation policy for the initial "researcher" (the "Researching Beneficiaries Policy"). *See* Gately Cert., Ex. 8. This document also contains language improperly suggesting the QPSA would always be 50%:

> Any plan governed under ERISA guarantees the surviving spouse **50 percent** of the settlement, regardless of the beneficiary designations noted on the decedent's original enrollment application.
> . . . .
> The spouse will be sent the Step 0 letter, REACT Statement, informing

him/her of the right to **50%** of the benefits . . . .

*Id.* at TIAA-LL_00009577.   Likewise, the document directs that when a spouse indicates he/she is pursuing a claim for death benefits, the claim should "be updated with the spouse at a **50%** designation." *Id.* at TIAA-LL_00009579.   Neither of these provisions consider the possibility that the spousal right could potentially exceed 50% based upon the applicable plan document.

In other words, even if TIAA was at the time checking plan-specific rules for the dozens (perhaps hundreds) of other issues that can arise when administering an ERISA Plan,[4] that does not mean that TIAA understood, prior to this litigation, that QPSA percentages had to be determined on a plan-by-plan basis and that individual plan language must always govern when calculating QPSA percentages.

39.     Specifically, as to the ETS 403(b) Plan, TIAA determined that Section 8.4 of the Plan "does not state that the 'Participant's <u>full</u> Account Balance' is to be applied to provide the qualified preretirement survivor annuity, and it would be unreasonable to construe Section 8.4 as if it included the word 'full' when Section 14.10 operates to incorporate the participant's [individual annuity contract] by reference and that contract specifies that 'one-half' (50%) of the account applies to provide the qualified preretirement survivor annuity." Ex. 2 (3/13/15 TIAA Ltr. at 6).

<u>**Plaintiff's Response:**</u>     Admitted that TIAA's decision contains the language

---

[4] As a QPSA only becomes relevant when a married participant dies prior to his/her retirement, the QPSA percentage is often irrelevant in beneficiary determinations.

quoted above. Denied that the 403(b) Plan does not provide for a 100% QPSA. Section 8.4 of the 403(b) Plan, titled "Qualified Preretirement Survivor Annuity," provides:

> If a married Participant dies before benefits have commenced, the Surviving Spouse of the Participant may elect to have the Participant's Account Balance converted into an Annuity Contract for the life of the Surviving Spouse (a "[QPSA]") unless any other Beneficiary has been designated pursuant to a Qualified Election.

403(b) Plan § 8.4. Similarly, § 8.2 states:

> This Section 8.2 **applies to all Participants**. Upon the death of a Participant, **the Participant's Account Balance shall be paid** to the Participant's Surviving Spouse, but if there is no Surviving Spouse, or if the Surviving Spouse has consented to a Qualified Election under Section 8.5(a) to the Participant's waiver of the Spousal death benefit and the designation of another Beneficiary, then to the Participant's designated Beneficiary. . . . A Participant may waive the Spousal death benefit described in this Section 8.2 at any time; provided, however, that no such waiver shall be effective unless it satisfies the Spousal Consent requirement described in Section 8.5(a).

*Id.* at § 8.2. As ETS conceded in its Decision, "**Section 8.2 on its face says that 100% goes to the spouse.**" ETS Decision, Ex. 17 to Leiwant Cert., at 5.

Sections 8.2 and 8.4 both use the term "Account Balance" to describe what is being used to fund the QPSA. The 403(b) Plan defines "Account Balance" as "[t]he bookkeeping account maintained for each Participant which reflects **the aggregate amount** credited to the Participant under all Accounts, including . . . the earnings or

loss of each Annuity Contract." 403(b) Plan, Ex. 1 to Leiwant Cert., § 1.2. The word "aggregate" in this context, must carry its well accepted, common meaning: "Formed by combining into a single whole or total." *Black's Law Dictionary* (8th ed.); *see also Merriam-Webster Collegiate Dictionary* 23 (10th ed. 1998) (defining "aggregate" as "the whole sum or amount"). While the words "full," "entire," or "100%" do not appear in §§ 8.2 or 8.4, there is no reason they should. The definition of "Account Balance" contains the word "aggregate," which is synonymous with those adjectives. As a matter of law, this definition must govern. *See* Plaintiff's Memorandum of Law in Opposition to ETS's Motion for Summary Judgment, Section III.C.

Additionally, TIAA's assertion that § 14.10 incorporates the Annuity Contracts and that these documents provide for a 50% QPSA is incorrect. First, as the Arbitrator already found the 1985 Endorsement does <u>not</u> set a 50% QPSA. *See* Gately Cert., Ex. 2, Initial Award at 30. Second, Section 14.10 of the 403(b) Plan provides that the "Terms and conditions of the Individual Agreements are hereby incorporated by refence into the Plan, **excluding those terms that are inconsistent with the Plan** or Code Section 403(b)." 403(b) Plan, Ex. 1 to Leiwant Cert. § 14.10. This comports with the 403(b) Plan's preliminary statement, which makes clear that to the extent there is a conflict between the Plan itself and a "Frozen Contract," the Plan will control. 403(b) Plan, Ex. 1 to Leiwant Cert., at LD1-08426. Because the 403(b) Plan "on its

face" provides for a 100% QPSA, if the 1985 Endorsement provided for a 50% QPSA, then the 1985 Endorsement would not be incorporated into the plan. Third, even if the annuity contracts were incorporated by reference, the language within the plan document would still control as a matter of federal law. *See* Internal Revenue Manual §§ 4.72.13.7(5), 4.72.13.7.7(6), 4.72.13.9.4(3) (Nov. 12, 2014) (stating that when a plan conflicts with the annuity contract, the Plan will control).

40.    TIAA found that this interpretation of the ETS 403(b) Plan, and the resulting initial benefit determination, was consistent with the language of the Educational Testing Service 403(b) Plan Summary Plan Description (2013 Revision) ("Summary Plan Description"). Ex. 2 (3/13/15 TIAA Ltr. at 8).

**Plaintiff's Response:**    Admitted that TIAA, in its Decision, attempted to justify its uniform practice of always assigning a 50% QPSA by referring to an external summary plan description. TIAA's reliance on this document was, however, erroneous as a matter of law. *See* Ex. 2 to Gately Cert., Initial Award at 33 (recognizing that it is "well-established that in the event of a conflict between the terms of the SPD and the Plan document that the Plan document must take precedence"); *see also CIGNA Corp. v. Amara*, 563 U.S. 421, 435-38 (2011). TIAA's counsel has offered the following description of the Supreme Court's decision in *Amara*: In *Amara*, "[t]he Court observed that Section 502(a)(1)(B) provides authority to enforce the terms of the plan, not to change those terms. Significantly, the Court rejected the argument that certain statutorily-required plan disclosures (e.g., a [SPD])

should be considered part of the 'plan' for purposes of Section 502(a)(1)(B)." Gately

Cert., Ex. 4, ERISA Litigation Update – Supreme Court Expounds on ERISA's

Remedial Provisions, at 2. Likewise, ETS conceded that external documents like

SPDs "do not control over the Plan terms." ECF 167-1, at 33 n.15.


41.    Plaintiff appealed the initial determination of her claim to the Plan
Administrator, the EBAC, on May 12, 2015. ECF No. 40-4 (Plaintiff's SUMF ¶ 36).

**Plaintiff's Response:**    Admitted.


42.    The EBAC denied Plaintiff's appeal on July 8, 2015. ECF No. 40-4
(Plaintiff's SUMF ¶ 36); Ex. 17 (7/8/15 Response to Appeal, LD1-07036 at -36).

**Plaintiff's Response:**    Admitted.


43.    In its denial, the EBAC addressed the following relevant sections of the
403(b) Plan: Sections 13.7 and 14.10, as those provisions incorporated the individual
annuity contracts into the 403(b) Plan, and Sections 8.2 and 8.4, which Plaintiff cited
in her appeal. Ex. 17 (7/8/15 Response to Appeal, LD1-07036 at - 40-41.

**Plaintiff's Response:**    Admitted that ETS's Decision does refer to these

provisions. Denied that these are the only provisions referenced in ETS's Decision.

*See* Leiwant Cert. Ex. 17, at 5-6. Also denied that ETS addressed all of the relevant

provisions at issue in its decision. For example, both ETS and TIAA failed to

acknowledge, let alone address § 1.2. Sections 8.2 and 8.4 both use the term

"Account Balance" to describe what is being used to fund the QPSA. The 403(b)

Plan defines "Account Balance" as "[t]he bookkeeping account maintained for each Participant which reflects **the aggregate amount** credited to the Participant under all Accounts, including . . . the earnings or loss of each Annuity Contract." 403(b) Plan, Ex. 1 to Leiwant Cert. § 1.2. The word "aggregate" in this context, must carry its well accepted, common meaning: "Formed by combining into a single whole or total." *Black's Law Dictionary* (8th ed.); *see also Merriam-Webster Collegiate Dictionary* 23 (10th ed. 1998) (defining "aggregate" as "the whole sum or amount"). While the words "full," "entire," or "100%" do not appear in Sections 8.2 or 8.4, there is no reason they should. The definition of "Account Balance" contains the word "aggregate," which is synonymous with those adjectives. As a matter of law, this definition must govern. *See* Plaintiff's Memorandum of Law in Opposition to ETS's Motion for Summary Judgment, Section III.C.

It is also denied that the Annuity Contracts were incorporated without exception in the Plan. Section 14.10 actually states that the "Terms and conditions of the Individual Agreements are hereby incorporated by refence into the Plan, **excluding those terms that are inconsistent with the Plan** or Code Section 403(b)." (emphasis added). This comports with the 403(b) Plan's preliminary statement, which makes clear that to the extent there is a conflict between the Plan itself and a "Frozen Contract," the Plan will control. 403(b) Plan, Ex. 1 to Leiwant Cert., at LD1-08426. This is consistent with federal law.

29

44.    Upon considering both TIAA's and Plaintiff's reading of Section 8 of the ETS 403(b) Plan and of the Contracts, the EBAC found Section 8 of the 403(b) Plan to be "ambigu[ous]." Ex. 17 (7/8/15 Response to Appeal at 1, LD1-07036).

**Plaintiff's Response:**    Admitted that ETS made that assertion in its Decision.  Denied that ETS's conclusion was correct.  Indeed, ETS also found the 401(a) Plan to be ambiguous, and both the Arbitrator and Judge Shipp have already held that the 401(a) Plan unambiguously provides for a 100% QPSA.  *See* Opinion, ECF 111, at 7-8; Initial Award, Ex. 2 to Gately Cert., at 28 ("That language, viewed objectively, is unambiguous and is capable of only one reasonable interpretation – i.e., that absent a Qualified Election waiving her right to benefits, Ms. Luciano as surviving spouse of Mr. Rosso, is entitled to receive a [QPSA] equal to the full account balance.").  If anything, ETS's finding of ambiguity in the 403(b) Plan is even more egregious, as ETS admitted that "Section 8.2 on its face says that 100% goes to the spouse."  Leiwant Cert., Ex. 17, at 5.

In finding "ambiguity," ETS failed to recognize, yet alone analyze, § 1.2 of the 403(B) Plan, which defines "Account Balance" as "[t]he bookkeeping account maintained for each Participant which reflects **the aggregate amount** credited to the Participant under all Accounts, including . . . the earnings or loss of each Annuity Contract."  403(b) Plan, Ex. 1 to Leiwant Cert., § 1.2.  As a matter of law, this definition must govern.  *See* Plaintiff's Memorandum of Law in Opposition to ETS's

Motion for Summary Judgment, Section III.C.

Furthermore, as set forth in detail in Lorraine's opposition to ETS's summary judgment motion, ETS's methodology violated federal law and is entitled to no deference. *See* Plaintiff's Memorandum of Law in Opposition to ETS's Motion for Summary Judgment, Sections III.B-E.

45.    In resolving the ambiguity, the EBAC "determined 'ETS' intent" as the 403(b) Plan directed it to do. Ex. 17 (7/8/15 Response to Appeal at 6). The EBAC looked to, among other things, the Contracts, the beneficiary designation forms, and TIAA's consistent administrative practice over many years of interpreting the 403(b) Plan and applying the TIAA annuity contracts issued to 403(b) Plan participants to provide 50% to the surviving spouse. Ex. 17 (7/8/15 Response to Appeal at 6).

**Plaintiff's Response:**    Admitted that ETS stated in its decision that it was purporting to determine the intent of the Plan and that ETS then invoked a host of extrinsic evidence to justify affirming TIAA's decision. Also admitted that ETS based its decision on TIAA's "consistent administrative practice over many years" of always assigning a 50% QPSA. Lorraine denies that ETS was permitted, under ERISA, to do this. As set forth in detail in Lorraine's opposition briefs, both the Arbitrator and Judge Shipp have already determined that ETS's methodology (which was the same for both the 401(a) and 403(b) Plans) was improper, and their decisions comport with binding precedent.

46.    The EBAC also determined that "the documents Mr. Rosso and other participants received and must be deemed to have acted in reliance upon, were clear that 50% would go to the surviving spouse, not 100%." Ex. 17 (7/8/15 Response to

31

Appeal at 6).

**Plaintiff's Response:**    Admitted that ETS's Decision contains the language quoted above.  Denied that purporting to examine external documents supposedly sent to Jim is permissible under ERISA.  As the Arbitrator explained:

> [S]ubjective donative intent is not material to the issue of what is required to be provided by the Plan as a QPSA.  The QPSA and REACT were intended to protect the rights of surviving spouses to receive retirement benefits in situations where either no such options were provided to surviving spouses or where the participant desired to provide the survivor benefits to someone else.

Initial Decision, Ex. 2 to Gately Cert., at 32–33; *see Line Const. Ben. Fund v. Big Sky Locators, Inc.*, No. 02-729, 2003 WL 21475124, at *3 (N.D. Ill. June 23, 2003) (rejecting considerations of subjective intent when the plan language was unambiguous).  Then, the Arbitrator concluded as a matter of fact, that even if he were to consider Jim's beneficiary designations, these documents do not "support any finding that [Jim] intended" for any of his benefits to go to his sister.  Initial Award, Ex. 2 to Gately Cert., at 32.

47.    The EBAC found that "it strains credulity to conclude that any participant would think that the surviving spouse is entitled to 100%" where the participant named someone else as his beneficiary and "that the reasonable expectation of Mr. Rosso and other participants like him, would be that 50% of his benefit will go to his surviving spouse, not 100%." Ex. 17 (7/8/15 Response to Appeal at 6).

**Plaintiff's Response:**    Admitted that ETS's Decision contains the language quoted above.  Denied that purported "donative intent" is a relevant consideration

when deciding an ERISA benefits claim.  As the Arbitrator explained:

> [S]ubjective donative intent is not material to the issue of what is required to be provided by the Plan as a QPSA.  The QPSA and REACT were intended to protect the rights of surviving spouses to receive retirement benefits in situations where either no such options were provided to surviving spouses or where the participant desired to provide the survivor benefits to someone else.

Initial Decision, Ex. 2 to Gately Cert., at 32–33; *see Line Const. Ben. Fund v. Big Sky Locators, Inc.*, No. 02-729, 2003 WL 21475124, at *3 (N.D. Ill. June 23, 2003) (rejecting considerations of subjective intent when the plan language was unambiguous).  Then, the Arbitrator concluded as a matter of fact, that even if he were to consider Jim's beneficiary designations, these documents do not "support any finding that [Jim] intended" for any of his benefits to go to his sister.  Initial Award, Ex. 2 to Gately Cert., at 32.

48.    The EBAC found it "highly significant that Mr. Rosso had gone through the process of filing beneficiary designations three times before he married Ms. Luciano and was well-versed in the steps he needed to take if he wanted to provide for Ms. Luciano to receive 100% of his benefit under each Plan. He knew he had to file a new beneficiary designation and that he had to file that designation with TIAA using its form. He never took the steps required to effect that result." Ex. 17 (7/8/15 Response to Appeal at 6-7).

**Plaintiff's Response:**    Admitted that ETS's Decision contains the language quoted above.  Denied that Jim's donative intent and purported knowledge is an appropriate consideration when deciding an ERISA benefits dispute. As the Arbitrator explained:

> [S]ubjective donative intent is not material to the issue of what is required
> to be provided by the Plan as a QPSA. The QPSA and REACT were
> intended to protect the rights of surviving spouses to receive retirement
> benefits in situations where either no such options were provided to
> surviving spouses or where the participant desired to provide the survivor
> benefits to someone else.

Initial Decision, Ex. 2 to Gately Cert., at 32–33; *see Line Const. Ben. Fund v. Big Sky Locators, Inc.*, No. 02-729, 2003 WL 21475124, at *3 (N.D. Ill. June 23, 2003) (rejecting considerations of subjective intent when the plan language was unambiguous). Then, the Arbitrator concluded as a matter of fact, that even if he were to consider Jim's beneficiary designations, these documents do not "support any finding that [Jim] intended" for any of his benefits to go to his sister. Initial Award, Ex. 2 to Gately Cert., at 32.

49.    TIAA continues to hold 100% of Mr. Rosso's 403(b) Plan account balance ($55,423.90). Ex. 18 (TIAA-LL_00003742, "Contracts in Scope" Tab at Row 155 and "Additional Research – Decedent" Tab at Row 32). None of it has been distributed, either to Plaintiff, who is now seventy-six years old, or to the Estate of Lucille Rosso. *Id.*; *see also* Ex. 19 (Luciano Depo. Tr. at 109:16-17).

**Plaintiff's Response:**    Admitted.

50.    For plans of which TIAA serves as a recordkeeper, TIAA catalogues the specific plan rules related to beneficiaries and spousal rights dictated by the various plan documents executed by their plan-sponsor clients ("Client Plan Rules"). Ex. 7 (TIAA Resp. to Rog. 10); Ex. 20 (TIAA Second Set of Resp. to April 2023 Rogs., Resp. to Rog. 9); Ex. 21 (30(b)(6) Depo. Tr. at 23:14-25:19). TIAA stored such "Client Plan Rules" in a system called "Plan Rules," and then later in its replacement, a system called "Plan Recordkeeping Institutional Management" or "PRISM." Ex. 21 (30(b)(6)

Depo. Tr. at 23:14-26:12)); Ex. 20 (TIAA Second Set of Resp. to April 2023 Rogs., Resp. to Rog. 9).

**Plaintiff's Response:**    Denied.  As a preliminary matter, Lorraine objects to TIAA's characterization of itself as a "record keeper."  As demonstrated in Lorraine's opposition briefs, TIAA was not just a recordkeeper, but was a fiduciary who was required to interpret plan language when making benefit determinations.

As to TIAA's vague, generalized statements that it may have, at some undefined period of time, catalogued certain plan-specific "rules" relating to "beneficiaries and spousal rights" in "Plan Rules" or PRISM can neither be admitted or denied, as this contention is beyond the scope of the litigation and, thus, discovery.

This litigation deals only with the proper calculation of QPSA percentages. While TIAA may *currently* catalogue specific plan rules related to beneficiaries and spousal rights, including QPSA percentages, this is also irrelevant. The relevant inquiry for summary judgment is, when TIAA decided Lorraine's QPSA percentage in 2014-15, did it do so based upon the specific terms of the applicable plan documents, or based upon its incorrect understanding that the QPSA should always be 50%.  To the extent TIAA contends its policy was—at the time it decided Lorraine's claim—to consult with specific plan rules when assigning a QPSA, that contention is denied, based upon the policy & procedure documents from the pre-litigation period that TIAA produced, as well as TIAA's contemporaneous statements.

While TIAA attaches post-litigation policy & procedure documents to its

motion, in discovery TIAA produced older policy & procedure documents that demonstrate TIAA's policy regarding QPSAs was much different when it decided Lorraine's claim.

As TIAA's corporate representative explained, beneficiary determinations are handled by TIAA's BRT, and consist of an initial review by a "researcher," which is then verified by the BRT's "quality control" team. Gately Cert., Ex. 7, at 30:14-18. TIAA submits the 2021 version of the policy & procedure document governing the secondary QC process (the "QC Beneficiary Research Policy"). *See* Leiwant Cert., Ex. 23. While TIAA did not produce the pre-litigation version of that policy, it did produce an earlier version (effective June 2016). *See* Gately Cert., Ex. 9. Comparing the 2016 and 2021 versions demonstrates that TIAA's policies have markedly changed over time, especially when it comes to QPSAs. For example, the specific step upon which TIAA relies in its statement of facts is "10. Review the Survivor Benefits Service section." In the 2021 version of the policy, there is an image showing four different specific questions/responses for each plan including, "Does the plan stipulate a minimum spousal pre-retirement death benefit percentage? ('QPSA')". Ex. 23 to Leiwant Cert at TIAA-LL_00011042. The 2016 version of the document, however, contains only 2 of the 4 questions. Critically, the question/response dealing with a specific QPSA percentage is **missing** from the 2016 version. *See* Gately Cert., Ex. 9 at TIAA-LL_00010306. Additionally, the 2016 version of the QC Beneficiary

Research Policy is missing other steps that appear in the 2021 version, such as instructing TIAA employees to review "Special Policy Text Rules."  *Compare* Ex. 23 to Leiwant Cert. at TIAA-LL_00011041 *with* Gately Cert., Ex. 9 at TIAA-LL_00010303-07.  For purposes of determining the supposedly proper QPSA percentage, the only guidance provided by the 2016 version is the following:

> For ERISA governed schools with post-84 monies for the participant, locate the spousal waiver and confirm the spouse has signed it or not.  **If the participant was married, the spouse is entitled to <u>50%</u> and must sign the waiver.**

*See* Gately Cert., Ex. 9 at TIAA-LL_00010302.

TIAA did produce its pre-litigation policy for the initial "researcher" (the "Researching Beneficiaries Policy").  *See* Gately Cert., Ex. 8.  This document also contains language improperly suggesting the QPSA would always be 50%:

> Any plan governed under ERISA guarantees the surviving spouse **50 percent** of the settlement, regardless of the beneficiary designations noted on the decedent's original enrollment application.
> . . . .
> The spouse will be sent the Step 0 letter, REACT Statement, informing him/her of the right to **50%** of the benefits . . . .

*Id.* at TIAA-LL_00009577.  Likewise, the document directs that when a spouse indicates he/she is pursuing a claim for death benefits, the claim should "be updated with the spouse at a **50%** designation."  *Id.* at TIAA-LL_00009579.  Neither of these provisions consider the possibility that the spousal right could potentially exceed 50% based upon the applicable plan document.

TIAA's prelitigation statements also confirm that, in 2014-15, TIAA was not making QPSA determinations based upon what the plan required, but instead was incorrectly assuming that the QPSA would always be 50%. Indeed, TIAA's Associate General Counsel, Margaret Byrne, Esq., was directly asked whether assigning a 50% QPSA was a uniform practice of TIAA. Studholme Cert. ¶ 15. Ms. Byrne confirmed that it was, stating, "**We always do it this way.**" *Id.* ¶ 16; *see also*, Plaintiff's Response to TIAA's Interrogatories, Ex. 10 to Gately Cert., Response to Interrogatory No. 11 ("Due to Ms. Byrne's statements, it became clear that that I was not the only person in this position: relying on a benefit I was entitled to as the wife of a person who died while still employed and covered by one or more of the Defendants' plans, but which the Defendants refused to pay, even in the absence of the required spousal waiver."), Response to Interrogatory No. 14.

Additional communications from Ms. Byrne both before and after this conversation confirm TIAA's understanding that the calculation of QPSA percentages had nothing to do with the specific plan's terms. In her initial response to Lorraine's objection to receiving a 50% QPSA, Ms. Byrne did not justify TIAA's decision on the terms of the governing plan documents, but instead cited to caselaw that analyzed completely different ERISA plans sponsored by entities other than ETS that contained different provisions. *See* Studholme Cert., ¶ 9, Ex. B. Later, Ms. Byrne would attempt to justify TIAA's practice of uniformly assigning a 50% QPSA based upon language

from the 1985 Endorsement to the Annuity Contracts.  *See id.* ¶¶ 17-18, Ex. E.  Indeed, Ms. Byrne separately suggested that the Plan was not even relevant as a Plan Document "generally goes to operation of the Plan as a whole" while other documents, like Annuity Contracts define beneficiary entitlements.  *See* Gately Cert., Ex. 13.

Separately, TIAA issued a warning to its plan sponsor clients that it would be making benefit determinations based upon the terms of the annuity contracts (including the 1985 Endorsement), **not** the terms of the plan itself:

> **Since the relationship between TIAA-CREF and plan participants is governed by the terms of the annuity contract or certificate, benefits will be determined by the terms of the contract or certificate."  It is therefore, essential that plan sponsors ensure that there is no conflict between the terms of the written plan and the terms of the [annuity contracts] used as funding vehicles.**

*See* Gately Cert., Ex. 12, at 2-3.  The foregoing statement would make no sense if TIAA's policy at the time was to follow plan language when making QPSA determinations.  In fact, at one point early in the litigation, TIAA resurrected this argument, contending that it was legally bound to distribute benefits in accordance with the annuity contracts' terms (*i.e.*, the 1985 Endorsement).  *See* ECF 51, at 8-9 ("First, it is well established that an insurer must comply with the terms of its agreements.  The fact that the insurer's contract is issued in connection with an employee benefit plan does not negate the insurer's contractual obligations.  **Accordingly, TIAA is required to pay contractual benefits under the terms of the contracts.**").  If TIAA truly believed—as it represented to the Court—that it was

required to calculate the QPSA according to the uniform terms of the annuity contracts issued to every participant regardless of the plan document that applied to the participant's specific plan, it would make no sense for TIAA to be reviewing plan documents during the beneficiary determination process for applicable QPSA language.

Further, it appears that in the pre-litigation period, TIAA misunderstood the QPSA requirement created by the REA. As set forth in a TIAA's 2008 beneficiary notice, TIAA stated that federal law provided that only 50% of benefits had to go to a Surviving Spouse and the "other 50% can go to any beneficiary that you choose." *See* 2008 Notice, Ex. 11 to Gately Cert., at 2. TIAA does not qualify this statement by taking into consideration that the participant's plan document could set the QPSA at a higher level.[5] The fact that TIAA mistakenly believed that the REA set the QPSA at exactly 50% may also help explain why TIAA adopted a uniform policy of always assigning a 50% QPSA.

In other words, even if TIAA was checking plan-specific rules for the dozens (perhaps hundreds) of other issues that can arise when making a benefit determination,

---

[5] To be clear, federal law does not set the QPSA at 50% in all circumstances. Instead, 29 U.S.C. § 1055(e)(2) provides that a Surviving Spouse is entitled to a QPSA "which is **not less than** 50 percent of the portion of the account balance of the participant." While this definition sets a floor—the actuarial equivalent of a QPSA must be at least fifty percent of a Participant's Account Balance—it does not set a ceiling. *See* Plaintiff's Memorandum of Law in Opposition to ETS's Motion for Summary Judgment, Section III.C.

that does not mean that TIAA understood, prior to this litigation, that QPSA percentages had to be (or, more importantly, in fact were) tracked on a plan-by-plan basis and that individual plan language must always govern when calculating QPSA percentages.

Separately, these earlier versions of TIAA's policies & procedures also contradict TIAA's contention that its BRT was, in 2014-2015, using TIAA's PRISM data system (which TIAA contends was tracking QPSA percentages since 2014) instead of TIAA's older "Plan Rules" system.  While TIAA's recent policy & procedure documents (*e.g.*, those from 2021-2022) refer to "PRISM" as the system used (Leiwant Cert., Ex. 23 at TIAA-LL_00011013), the policy & procedure documents from 2012-16 still explicitly refer to "Plan Rules" as the system employed. *See* Gately Cert., Ex. 8, at TIAA-LL_00009566. As to this older system, TIAA's Corporate Representative did not affirmatively assert that "Plan Rules" also tracked QPSA percentages, instead testifying that she could only "assume" that was the case. Gately Cert., Ex. 7, at 173:13-18.  Indeed, TIAA later confirmed that "historical data" was not maintained for any plan-specific "rules" (such as QPSA percentage) in its "Plan Rules" system.  *See* Leiwant Cert., Ex. 20, Response to Interrogatory No. 9 at (ii).

51.    TIAA settles individual benefits pursuant to those Client Plan Rules relevant to the plan at issue. Ex. 7 (TIAA resp. to Rog. 10); Ex. 20 (TIAA Second Set

of Resp. to April 2023 Rogs., Resp. to Rog. 9); Ex. 21 (30(b)(6) Depo. Tr. at 346:17-347:24); Ex. 22 (30(b)(6) Errata).

**Plaintiff's Response:**    Denied.    While TIAA may *currently* determine applicable QPSA percentages based upon what the specific plan requires, TIAA did not calculate QPSA percentages based upon the specific plan's terms when it decided Lorraine's claim.

After Jim's death, the distribution of Jim's account balances for both the 401(a) and 403(b) Plans was handled by TIAA.  Studholme Cert. ¶ 8.  TIAA sent several form letters to Lorraine.  *See id.*, Ex. A.  These letters appear to be form documents generated by TIAA and not specific to the two plans at issue.  *Id.*  While these letters do not explicitly state that Lorraine was only going to receive a QPSA funded with only 50% of Jim's account balances, the "total" in TIAA's June 30, 2014 letter was only half of Jim's account balances.  *Id.*

After learning that TIAA was planning to distribute a QPSA funded only with 50% of Jim's account balances, Lorraine objected.  Studholme Cert. ¶ 9.  In response, TIAA's Associate General Counsel, Ms. Byrne, sent an email setting forth TIAA's reasoning for awarding only a 50% QPSA, not just in Lorraine's case, but always.  *See id.*, ¶ 10, Ex. B.  TIAA did not base its conclusion on the language of the governing plan documents, but instead on caselaw dealing with completely different ERISA plans sponsored by entities other than ETS that contained different plan language.  *Id.*  Further, Ms. Byrne provided what she claimed to be the history of the REA statute

and what she called a custom being established "through the years as establishing a kind of federal 'right of election' if there is a spouse at death to a benefit to be funded by 50% of the account balance . . . under REACT they get 50% if they do not consent to the designation-they do not get an unfettered right to control the entire amount." *Id.* This misstatement of law was proffered by TIAA as the reason no surviving spouse would ever receive more than a 50% QPSA. *Id.*

At the time TIAA participated in the foregoing email chain, it did not even know what the governing plan documents were. *Id.* ¶ 11. Specifically, the next day, TIAA sent an email purporting to attach the "relevant documents" relating to this dispute. TIAA only attached, however, the summary plan description for, and the 2007 version of, ETS's 403(b) Plan. *See* Ex. C. In other words, TIAA did not realize Jim was a participant in two separate ERISA plans sponsored by ETS (which are governed by completely different sections of ERISA), each of which was governed by a separate plan document. In fact, several months later, on October 4, 2014, TIAA (again through Associate General Counsel Byrne) sent another email attaching the 2009 version of the plan document for ETS's 401(a) Plan. *See id.* ¶ 12, Ex. D. Clearly, TIAA still didn't understand there were two separate plan documents for the two separate plans. Instead, Ms. Byrne wrote that the new document (*i.e.*, the 401(a) Plan) was "applicable to Mr. Rosso's account**s**."

Indeed, the issue of TIAA's policy for making QPSA determinations was

directly addressed in a telephone call between Ms. Byrne and Lorraine's counsel, Anne Studholme, Esq.  As Ms. Studholme explains:

> 15.    When communicating with Ms. Byrne, I candidly disclosed that I was researching a potential class action and made clear that I was focused on whether providing a "one half" QPSA was indeed a universal practice of TIAA, regardless of the language in the Plan.

> 16.    Ms. Byrne confirmed that it was.  She said, "We always do it this way."  Under the circumstances, I was pleasantly surprised by her candor.  She said that no one had ever asked, as Mr. Demaree and I were asking, to review the controlling Plan document in representing a beneficiary claiming a contested QPSA.

Studholme Cert. ¶¶ 15-16; *see also* Gately Cert. Ex. 10, Plaintiff's Response to TIAA's Interrogatories, Response to Interrogatory No. 11 ("Due to Ms. Byrne's statements, it became clear that that I was not the only person in this position: relying on a benefit I was entitled to as the wife of a person who died while still employed and covered by one or more of the Defendants' plans, but which the Defendants refused to pay, even in the absence of the required spousal waiver."), Response to Interrogatory No. 14.

Subsequent correspondence from Ms. Byrne confirms that TIAA's improper practice of always assigning a 50% QPSA likely derived from the fact that TIAA, following REACT's passage, added the 1985 Endorsement to all of its annuity contracts, which TIAA incorrectly assumed would mandate a 50% QPSA in all situations.  *See* Studholme Cert. ¶¶ 17-18, Ex. E. Indeed, Ms. Byrne separately suggested that the Plan was not even relevant as a Plan Document "generally goes to

operation of the Plan as a whole" while other documents, like Annuity Contracts define beneficiary entitlements.  *See* Gately Cert., Ex. 13.

It is logical to assume that TIAA, after adding the 1985 Endorsement to every Annuity Contract and incorrectly reading the 1985 Endorsement as always mandating a flat 50% QPSA, would thereafter uniformly assign a 50% QPSA in all circumstances, even when the plan document provided otherwise.  Indeed, TIAA expressly warned its clients that it would be making benefit determinations based upon the terms of the Annuity Contracts (including the 1985 Endorsement), **not** the terms of the plan itself:

> **Since the relationship between TIAA-CREF and plan participants is governed by the terms of the annuity contract or certificate, benefits will be determined by the terms of the contract or certificate."  It is therefore, essential that plan sponsors ensure that there is no conflict between the terms of the written plan and the terms of the [annuity contracts] used as funding vehicles.**

*See* Gately Cert., Ex. 12, at 2-3.  TIAA's statement would make no sense if TIAA's policy at the time was to follow plan language when calculating QPSA percentages. TIAA's statement, however, is completely consistent with Ms. Byrne's admissions.

In fact, at one point early in the litigation, TIAA resurrected this argument, contending that it was legally bound to distribute benefits in accordance with the annuity contracts' terms.  *See* TIAA Reply Br., ECF 51, at 8-9 ("First, it is well established that an insurer must comply with the terms of its agreements.  The fact that the insurer's contract is issued in connection with an employee benefit plan does not negate the insurer's contractual obligations.  **Accordingly, TIAA is required to pay**

**contractual benefits under the terms of the contracts.**").  If TIAA truly believed— as it represented to the Court—that it was required to pay benefits according to the uniform terms of the annuity contracts issued to every participant regardless of the governing plan's terms, it would make no sense for TIAA to be reviewing plan documents when calculating QPSA percentages, as it now, in the wake of this litigation, claims to do.

Further, it appears that in the pre-litigation period, TIAA misunderstood the QPSA requirement created by the REA.  As set forth in a TIAA 2008 beneficiary notice, TIAA incorrectly advised federal law provided that only 50% of benefits had to go to a Surviving Spouse and the "other 50% can go to any beneficiary that you choose."  *See* 2008 Notice, Ex. 11 to Gately Cert., at 2.  TIAA does not qualify this statement by taking into consideration that the participant's plan document could set the QPSA at a higher level.[6]  The fact that TIAA mistakenly believed that the REA set

---

[6] To be clear, federal law does not set the QPSA at 50% in all circumstances. Instead, 29 U.S.C. § 1055(e)(2) provides that a Surviving Spouse is entitled to a QPSA "which is **not less than** 50 percent of the portion of the account balance of the participant."  While this definition sets a floor—the actuarial equivalent of a QPSA must be at least fifty percent of a Participant's Account Balance—it does not set a ceiling.  Thus, a QPSA can be from 50% to 100% of a Participant's Account Balance, depending upon the terms of the plan.  Multiple courts have adjudicated claims involving plans that required 100% QPSAs.  *See Cottillion v. United Ref. Co.*, 781 F.3d 47, 61 (3d Cir.), *cert. denied*, 136 S. Ct. 198 (2015) ("But for the reasons stated above, these Plans expressly provided TVPs with more than the statutory floor."); *Lasche v. George W. Lasche Basic Profit Sharing Plan*, 111 F.3d 863, 867 (11th Cir. 1997) (affirming award to surviving spouse of participant's entire account); *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (awarding surviving spouse all of

the QPSA at exactly 50% may also help explain why TIAA adopted a uniform policy of always assigning a 50% QPSA.

To contradict the foregoing, TIAA provides the Court with its post-litigation policies & procedures, but these documents cannot show what TIAA's policy was when it decided Lorraine's claim. TIAA did, however, produce older policy & procedure documents in discovery, which confirm Ms. Byrne's admission that TIAA would—prior to the litigation—uniformly assign a 50% QPSA regardless of what the governing plan document required.

As TIAA's corporate representative explained, beneficiary determinations are handled by TIAA's BRT, and consist of an initial review by a "researcher," which is then verified by the BRT's "quality control" team. Gately Cert., Ex. 7, at 30:14-18. TIAA submits the 2021 version of the policy & procedure document governing the secondary QC process (the "QC Beneficiary Research Policy"). *See* Leiwant Cert., Ex. 23. While TIAA did not produce the pre-litigation version of that policy, it did produce an earlier version (effective June 2016). *See* Gately Cert., Ex. 9. Comparing

---

participant's benefits notwithstanding participant's beneficiary designations); *Buchner v. Buchner Bros. Plumbing & Heating Co.*, 699 F. Supp. 1371, 1380 (W.D. Wis. 1988) ("The plan amendment which provided that a non-waiving spouse be entitled to 100 percent of the annuity was not yet effective on the date of death."); *Donohue v. Shell Provident Fund*, 656 F. Supp. 905, 908 (S.D. Tex. 1987) (finding that a surviving spouse was entitled to "all of the participant's plan accounts" even though the participant had designated others as beneficiaries because such designations were made without the surviving spouse's consent).

the 2016 and 2021 versions demonstrates that TIAA's policies have markedly changed over time, especially when it comes to QPSAs.  For example, the specific step upon which TIAA relies in its statement of facts is "10. Review the Survivor Benefits Service section." In the 2021 version of the policy, there is an image showing four different specific questions/responses for each plan including, "Does the plan stipulate a minimum spousal pre-retirement death benefit percentage? ('QPSA')".  Ex. 23 to Leiwant Cert at TIAA-LL_00011042.  The 2016 version of the document, however, contains only 2 of the 4 questions.  Critically, the question/response dealing with a specific QPSA percentage is **missing** from the 2016 version.  *See* Gately Cert., Ex. 9 at TIAA-LL_00010306.   Additionally, the 2016 version of the QC Beneficiary Research Policy is missing other steps that appear in the 2021 version, such as instructing TIAA employees to review "Special Policy Text Rules."  *Compare* Ex. 23 to Leiwant Cert. at TIAA-LL_00011041 *with* Gately Cert., Ex. 9 at TIAA-LL_00010303-07.   For purposes of determining the supposedly proper QPSA percentage, the only guidance provided by the 2016 version is the following:

> For ERISA governed schools with post-84 monies for the participant, locate the spousal waiver and confirm the spouse has signed it or not.  **If the participant was married, the spouse is entitled to <u>50%</u> and must sign the waiver.**

*See* Gately Cert., Ex. 9 at TIAA-LL_00010302.

TIAA did produce its pre-litigation policy for the initial "researcher" (the "Researching Beneficiaries Policy").  *See* Gately Cert., Ex. 8.  This document also

contains language improperly suggesting the QPSA would always be 50%:

> Any plan governed under ERISA guarantees the surviving spouse **50 percent** of the settlement, regardless of the beneficiary designations noted on the decedent's original enrollment application.
> . . . .
> The spouse will be sent the Step 0 letter, REACT Statement, informing him/her of the right to **50%** of the benefits . . . .

*Id.* at TIAA-LL_00009577.   Likewise, the document directs that when a spouse indicates he/she is pursuing a claim for death benefits, the claim should "be updated with the spouse at a **50%** designation." *Id.* at TIAA-LL_00009579.   Neither of these provisions consider the possibility that the spousal right could potentially exceed 50% based upon the applicable plan document.

In other words, even if TIAA was at the time checking plan-specific rules for the dozens (perhaps hundreds) of other issues that can arise when administering an ERISA Plan,[7] that does not mean that TIAA understood, prior to this litigation, that QPSA percentages had to be determined on a plan-by-plan basis and that individual plan language must always govern when calculating QPSA percentages.

Separately, these earlier versions of TIAA's policies & procedures also contradict TIAA's contention that its BRT was, in 2014-2015, using TIAA's PRISM data system (which TIAA contends was tracking QPSA percentages since 2014)

---

[7] As a QPSA only becomes relevant when a married participant dies prior to his/her retirement, the QPSA percentage is often irrelevant in beneficiary determinations.

instead of TIAA's older "Plan Rules" system.  While TIAA's recent policy & procedure documents (*e.g.*, those from 2021-2022) refer to "PRISM" as the system used (Leiwant Cert., Ex. 23 at TIAA-LL_00011013), the policy & procedure documents from 2012-16 still explicitly refer to "Plan Rules" as the system employed. *See* Gately Cert., Ex. 8, at TIAA-LL_00009566.  As to this older system, TIAA's Corporate Representative did not affirmatively assert that "Plan Rules" also tracked QPSA percentages, instead testifying that she could only "assume" that was the case. Gately Cert., Ex. 7, at 173:13-18.  Indeed, TIAA later confirmed that "historical data" was not maintained for any plan-specific "rules" (such as QPSA percentage) in its "Plan Rules" system.  *See* Leiwant Cert., Ex. 20, Response to Interrogatory No. 9 at (ii).

52.    TIAA's standard operating procedures during the putative class period instructed TIAA associates to "[r]eview the Survivor Benefits Services section [of PRISM]," including whether the specific plan at-issue "stipulate[s] a minimum spousal pre-retirement death benefit percentage." Ex. 23 (TIAA-LL_00011008 at 11011, 11042).

**Plaintiff's Response**:    Denied.  The document that TIAA references is not the version of the document did not exist when TIAA decided Lorraine's claim for benefits.  Exhibit 23, is a document titled "Performing Quality Control Verification on Beneficiary Research" (the "QC Beneficiary Research Policy") which TIAA claims is "dated July 2011."  Leiwant Cert. ¶ 24.  This assertion is misleading because

this document was revised multiple times since July 2011 (Ex. 23 to Leiwant Cert. at TIAA-LL_00011073).   As such, this document can only speak to what TIAA's policies after April 2, 2021.

While TIAA did not produce the pre-litigation version of that policy, it did produce an earlier version (effective June 2016).  *See* Gately Cert., Ex. 9.  Comparing the 2016 and 2021 versions demonstrates that TIAA's policies have markedly changed over time, especially when it comes to QPSAs.  For example, the specific step upon which TIAA relies in its statement of facts is "10. Review the Survivor Benefits Service section." In the 2021 version of the policy, there is an image showing four different specific questions/responses for each plan including, "Does the plan stipulate a minimum spousal pre-retirement death benefit percentage? ('QPSA')".  Ex. 23 to Leiwant Cert at TIAA-LL_00011042.  The 2016 version of the document, however, contains only 2 of the 4 questions.  Critically, the question/response dealing with a specific QPSA percentage is **missing** from the 2016 version.  *See* Gately Cert., Ex. 9 at TIAA-LL_00010306.   Additionally, the 2016 version of the QC Beneficiary Research Policy is missing other steps that appear in the 2021 version, such as instructing TIAA employees to review "Special Policy Text Rules."  *Compare* Ex. 23 to Leiwant Cert. at TIAA-LL_00011041 *with* Gately Cert., Ex. 9 at TIAA-LL_00010303-07.   For purposes of determining the supposedly proper QPSA percentage, the only guidance provided by the 2016 version is the following:

> For ERISA governed schools with post-84 monies for the participant, locate the spousal waiver and confirm the spouse has signed it or not. **If the participant was married, the spouse is entitled to <u>50%</u> and must sign the waiver.**

*See* Gately Cert., Ex. 9 at TIAA-LL_00010302.

TIAA did produce its pre-litigation policy for the initial "researcher" (the "Researching Beneficiaries Policy"). *See* Gately Cert., Ex. 8. This document also contains language improperly suggesting the QPSA would always be 50%:

> Any plan governed under ERISA guarantees the surviving spouse **50 percent** of the settlement, regardless of the beneficiary designations noted on the decedent's original enrollment application.
> . . . .
> The spouse will be sent the Step 0 letter, REACT Statement, informing him/her of the right to **50%** of the benefits . . . .

*Id.* at TIAA-LL_00009577. Likewise, the document directs that when a spouse indicates he/she is pursuing her claim for death benefits, the claim should "be updated with the spouse at a **50%** designation." *Id.* at TIAA-LL_00009579. Neither of these provisions consider the possibility that the spousal right could potentially exceed 50% based upon the applicable plan document.

In other words, even if TIAA was at the time checking plan-specific rules for the dozens (perhaps hundreds) of other issues that can arise when administering an ERISA Plan, that does not mean that TIAA understood, prior to this litigation, that QPSA percentages had to be determined on a plan-by-plan basis and that individual plan language must always govern when calculating QPSA percentages

TIAA's prelitigation statements also confirm that, in 2014-15, TIAA was not making QPSA determinations based upon what the plan required, but instead was incorrectly assuming that the QPSA would always be 50%. Indeed, TIAA's Associate General Counsel, Margaret Byrne, Esq., was directly asked whether assigning a 50% QPSA was a uniform practice of TIAA. Studholme Cert. ¶ 15. Ms. Byrne confirmed that it was, stating, "We always do it this way." *Id.* ¶ 16; *see also* Gately Cert. Ex. 10, Plaintiff's Response to TIAA's Interrogatories, Response to Interrogatory No. 11 ("Due to Ms. Byrne's statements, it became clear that that I was not the only person in this position: relying on a benefit I was entitled to as the wife of a person who died while still employed and covered by one or more of the Defendants' plans, but which the Defendants refused to pay, even in the absence of the required spousal waiver."), Response to Interrogatory No. 14.

Additional communications from Ms. Byrne both before and after this conversation confirm TIAA's understanding that the calculation of QPSA percentages had nothing to do with the specific plan's terms. In her initial response to Lorraine's objection to receiving a 50% QPSA, Ms. Byrne did not justify TIAA's decision on the terms of the governing plan documents, but instead cited to caselaw that analyzed completely different ERISA plans sponsored by entities other than ETS that contained different provisions. *See* Studholme Cert., ¶ 9, Ex. B. Subsequent correspondence from Ms. Byrne confirms that TIAA's improper practice of always assigning a 50%

QPSA likely derived from the fact that TIAA, following REACT's passage, added the 1985 Endorsement to all of its annuity contracts, which TIAA incorrectly assumed would mandate a 50% QPSA in all situations. *See* Studholme Cert. ¶¶ 17-18, Ex. E. Indeed, Ms. Byrne separately suggested that the Plan was not even relevant as a Plan Document "generally goes to operation of the Plan as a whole" while other documents, like Annuity Contracts define beneficiary entitlements. *See* Gately Cert., Ex. 13.

Separately, TIAA issued a warning to its plan sponsor clients that it would be making benefit determinations based upon the terms of the annuity contracts (including the 1985 Endorsement), **not** the terms of the plan itself:

> **Since the relationship between TIAA-CREF and plan participants is governed by the terms of the annuity contract or certificate, benefits will be determined by the terms of the contract or certificate." It is therefore, essential that plan sponsors ensure that there is no conflict between the terms of the written plan and the terms of the [annuity contracts] used as funding vehicles.**

*See* Gately Cert., Ex. 12, at 2-3. The foregoing statement would make no sense if TIAA's policy at the time was to follow plan language when making QPSA determinations. In fact, at one point early in the litigation, TIAA resurrected this argument, contending that it was legally bound to distribute benefits in accordance with the annuity contracts' terms (*i.e.*, the 1985 Endorsement). *See* ECF 51, at 8-9 ("First, it is well established that an insurer must comply with the terms of its agreements. The fact that the insurer's contract is issued in connection with an employee benefit plan does not negate the insurer's contractual obligations.

**Accordingly, TIAA is required to pay contractual benefits under the terms of the contracts.**"). If TIAA truly believed—as it represented to the Court—that it was required to calculate the QPSA according to the uniform terms of the annuity contracts issued to every participant regardless of the plan document that applied to the participant's specific plan, it would make no sense for TIAA to be reviewing plan documents during the beneficiary determination process for applicable QPSA language.

Further, it appears that in the pre-litigation period, TIAA misunderstood the QPSA requirement created by the REA. As set forth in TIAA's 2008 beneficiary notice, TIAA stated that federal law provided that only 50% of benefits had to go to a Surviving Spouse and the "other 50% can go to any beneficiary that you choose." *See* 2008 Notice, Ex. 11 to Gately Cert., at 2. TIAA does not qualify this statement by taking into consideration that the participant's plan document could set the QPSA at a higher level.[8] Had TIAA considered the possibility, it would have said something like: the "other 50% can go to any beneficiary that you choose *subject to the applicable*

_____

[8] To be clear, federal law does not set the QPSA at 50% in all circumstances. Instead, 29 U.S.C. § 1055(e)(2) provides that a Surviving Spouse is entitled to a QPSA "which is **not less than** 50 percent of the portion of the account balance of the participant." While this definition sets a floor—the actuarial equivalent of a QPSA must be at least fifty percent of a Participant's Account Balance—it does not set a ceiling. Thus, a QPSA can be from 50% to 100% of a Participant's Account Balance, depending upon the terms of the plan. *See* Plaintiff's Memorandum of Law in Opposition to ETS's Motion for Summary Judgment, Section III.C.

*terms of your plan*." The fact that TIAA mistakenly believed that the REA set the QPSA at exactly 50% further explains why TIAA adopted a uniform policy of always assigning a 50% QPSA.

53.    A "job aid" that TIAA associates used as a reference in settling benefit claims during the putative class period instructed them to "research Plan Rules to find . . . anything that tells you who would be or should not be a beneficiary." Ex. 24 (TIAA-LL_00011907 at 11923). This job aid included an example of a plan document that "requires a 100% Spousal Right, unless a spousal waiver is provided." *Id.*

**Plaintiff's Response:**    Admitted that the document contains the language quoted above. Denied that this "Job Aid" was used when deciding Lorraine's claim. Indeed, this "job aid" was generated **in 2017** by TIAA **after** Plaintiff initiated this litigation and was put on notice that TIAA's then-operative uniform policy violates ERISA and TIAA's obligations as administrator and fiduciary. *See* Leiwant Cert., Ex. 24. It is also denied that the "Job Aid" sets forth TIAA's policy when it decided Lorraine's claim. As set forth above in response to SoF ¶¶ 50-52, the record demonstrates that TIAA's pre-litigation policy was to assign a 50% QPSA, regardless of what the governing plan document required.

54.    TIAA followed the standard operating procedures outlined above to settle benefit claims when a married participant in an ERISA-governed plan passes away prior to their annuity start date and is survived by their spouse as follows: (1) per ERISA, the participant's surviving spouse automatically receives at least 50 percent of the participant's account balance absent a waiver; and (2) TIAA reviews the Client Plan Rules to determine whether the Plan requires a surviving spouse to

receive more than 50 percent and if so, settles the benefits according to the applicable Client Plan Rule. Ex. 21 (30(b)(6) Depo. Tr. at 346:17-347:24); Ex. 22 (30(b)(6) Errata).

**Plaintiff's Response:**        Denied.  As set forth above in response to SoF ¶¶ 50-

52, the record demonstrates that TIAA's pre-litigation policy was to assign a 50%

QPSA, regardless of what the governing plan document required.

Respectfully submitted,

Dated: January 21, 2025        */s/ Matthew F. Gately*
                              **COHN LIFLAND PEARLMAN
                                 HERRMANN & KNOPF LLP**
                              MATTHEW F. GATELY
                                 mfg@njlawfirm.com
                              Park 80 West – Plaza One
                              250 Pehle Avenue, Suite 401
                              Saddle Brook, NJ  07663
                              (201) 845-9600 (telephone)
                              (201) 845-9423 (fax)

                              **POST, POLAK, P.A.**
                              FREDERICK B. POLAK
                                 fpolak@postpolak.com
                              ANNE L.H. STUDHOLME
                                 astudholme@postpolak.com
                              425 Eagle Rock Avenue, Suite 200
                              Roseland, NJ  07068-1717
                              (973) 228-9900 (telephone)
                              (973) 994-1705 (fax)

                              *Attorneys for Plaintiff and for
                              Proposed Classes and Sub-Classes
                              of All Individuals Similarly Situated*